In re Steve AYERS, fmly d/b/a Sparta Jewelers, Dunlap Jewelry Shop, and Diamond Jewelers, and Linda Bayne Ayers, Debtors.

The EVERWED CO., Harry D. Lewis, Trustee, First National Bank of Pikeville, Tennessee, Plaintiffs,

v.

Steve AYERS, and wife, Linda Bayne Ayers, fmly d/b/a Sparta Jewelers, Dunlap Jewelry Shop, and Diamond Jewelers, Defendants.

Bankruptcy Nos. 280–00369, 280–00370. Adv. Nos. 280–0346, 280–0417.

United States Bankruptcy Court, M.D. Tennessee.

May 4, 1982.

Daniel H. Rader, III, Cookeville, Tenn., for Everwed Co.

Harry D. Lewis, Nashville, Tenn., for trustee.

David J. Fulton, Chattanooga, Tenn., for First Nat. Bank of Pikeville.

Aron P. Thompson, Cookeville, Tenn., for defendants.

## MEMORANDUM

PAUL E. JENNINGS, Bankruptcy Judge.

Trustee, Plaintiff Harry D. Lewis and Plaintiffs Everwed Co. and First National Bank of Pikeville, Tennessee assert that debtors Steve Ayers, Linda Bayne Ayers (Case No. 280–00369) and Steve Ayers, formerly d/b/a Sparta Jewelers, Dunlap Jewelry Shop and Diamond Jewelers (Case No. 280–00370) should not be granted a discharge in bankruptcy. Plaintiffs assert that the debtors' discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(2)(A), 727(a)(2)(B), 727(a)(4)(A), 727(a)(4)(D), 727(a)(5), and 727(a)(7). The trustee further asserts that should the debtors be granted a discharge, their claims for exemptions should not be allowed pursuant to 11 U.S.C. § 522(g). Plaintiff First National Bank of Pikeville also asserts that should the debtors be granted a discharge, their debt to said plaintiff should be excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), and/or 523(a)(6). The following shall constitute findings of fact and conclusions of law pursuant to Rule 752, F.R.B.P.

## I. OBJECTIONS TO DISCHARGE

█ The objections to the debtors' discharge will be considered first since a denial of discharge obviously would render the exemption and nondischargeability questions moot. The statutory provisions upon which the plaintiffs base their objections are as follows:

727(a)(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

\* \* \* \* \* \*

(7) the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6) of this subsection, on or within one year before the filing of the petition, or during the case, in connection with another case concerning an insider; . . . .

### A. The $27,000 Transaction

The center of most of the controversy is the debtors' expenditure of a large sum of money which was not reported on the debtors' schedules filed with their bankruptcy petitions. On January 10, 1980, the debtors caused to be issued a check on an account at the First National Bank of Sparta, Tennessee, in the amount of $27,000.00. The testi-

mony before the court showed that on that date the debtors were in a difficult financial position and had attempted to obtain further loans from the First National Bank at Sparta, these loans being denied. The proof is clear that the $27,000.00 was from receipts from the jewelry store owned by the debtors in Sparta. Either on January 10 or 11 the $27,000.00 was deposited in the White County Bank. The debtors were attempting to obtain a loan from the White County Bank in the approximate amount of $30,000.00 and hoped that the moving of the money from First National Bank to White County Bank would assist in obtaining that loan. Within two to four days the debtors were advised by officers at the White County Bank that the loan would not be made. Accordingly, the debtors caused to be issued a check in the amount of $27,000.00 drawn on the White County account and the money was paid to the debtors in cash. On February 8, 1980, the debtors filed bankruptcy. On the individual petitions, the debtors listed no cash on hand. On the business petitions, the debtors listed $5,000.00 as cash on hand. The facts and circumstances surrounding the expenditure of the approximate amount of $22,000.00 are in dispute.

Plaintiffs complain that there was no mention of the White County Bank or any transaction involving it during the past two years by the debtors in any of the petitions even though the $27,000.00 transaction had occurred less than 30 days prior to bankruptcy. They also complain there were no books and records offered which explain where or how the money was spent. Plaintiffs allege that the $27,000.00 was withdrawn from the bank and expended with the intent to defraud, delay or hinder the debtors' creditors.

It has been stated that "an omission of property which should have been on the schedules is, in the absence of a showing to the contrary, intentional and fraudulent." *Merritt v. Peters,* 28 F.2d 679, 680 (9th Cir.1928). *See also Robertson-Cheatham County Farmers Coop v. Inabet,* BK No. 77–30024 (M.D.Tenn.1977) (B.J.); *Crabtree v. Phipps,* 148 F.2d 524 (4th Cir.1945) *aff'd*

59 F.Supp. 731 (D.C.Va.1944). However, some cases have held that omissions from schedules resulting in concealment which were due to oversight and misunderstanding do not bar discharge since the omissions were not knowingly and fraudulently made. *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128, Bankr.L.Reps. CCH ¶ 63,950 (9th Cir. 1971); *In re Studley,* 35 F.Supp. 277, Bankr. L.Reps. ¶ 52,757 (D.C.Me.1940). The obvious difference in the two theories is upon whom the burden of proof is placed. The courts which presume fraudulent intent place the burden on the debtor to prove his lack of fraudulent intent while the latter courts require the objecting party to prove fraudulent intent as an element of concealment. The determination for the court is the same—were the omissions made with fraudulent intent?

It is undisputed that there were omissions on the debtors' schedules. It is clear that a full and complete explanation would have substantially simplified the instant proceedings. The debtors deny that they are guilty of any wrongdoing and allege that they consulted with their attorney concerning all of the events in question and, further, that they relied on and followed the advice of their attorney at all times.

In the case of *In re Slagle,* BK. No. 72–862 (M.D.Tenn. Dec. 23, 1975) (B.J.), this court followed the rule as stated in *Dilworth v. Boothe,* 69 F.2d 621 (5th Cir.1934):

> The rule is that when a bankrupt acts on the advice of counsel after a full disclosure of the facts to him, fraudulent intent may be presumed to be absent. 69 F.2d at 623.

In *Pioneer Bank of Chattanooga v. Hays,* BK. No. 1–77–00468 (E.D.Tenn. Jan. 17, 1978) (B.J.) this court held that the oath was not willfully false if the items were omitted by mistake or upon the honest advice of counsel, to whom the debtor disclosed all of the facts relative to such items. *See also Jones v. Gertz,* 121 F.2d 782, CCH Bankr.L.Repts. ¶ 53,318 (10th Cir.1941); "Reliance on Advice of Counsel", 70 Yale L.J. 978 (May 1961). This court has also

followed the reasoning used in *Friendly Finance Discount Corp. v. Jones,* 490 F.2d 452 (5th Cir.1974):

> Bankruptcy schedules are prepared by counsel, and a bankrupt will understandably rely on his attorney to guide him safely through the proceedings. 490 F.2d at pp. 456–7.

*See In re Slagle, supra.* The court in *In the Matter of Topper,* 229 F.2d 691, CCH Bankr.L.Repts. ¶ 58,517 (3rd Cir.1956) made the following statements:

> The bankruptcy schedules are prepared by counsel and indeed the Bankruptcy Act provides for the payment of a fee for counsel for the preparation of schedules. It is entirely understandable that a bankrupt may be guided by the opinion of his counsel as to what comes within the meaning of the provisions of the Bankruptcy Act—specifically what shall be included in the Schedules. We have held that the advice of counsel may be an excuse for inaccurate or false oath; *Dilworth v. Boothe,* 5 Cir.1934, 69 F.2d 621; *Thompson v. Eck,* 2 Cir., 1945, 149 F.2d 631. In the latter case the court stated, at page 633: "There was proof that the bankrupt made out his schedules on his attorney's advice. This is ordinarily enough to show the necessary (fraudulent) intent is lacking." See also 1 Collier, Bankruptcy, Sec. 14.23 (14th ed. 1940).

The schedules required to be filed with the bankruptcy petitions are very complete and detailed in nature and, if filled out correctly, these schedules provide all of the relevant information concerning the debtors. In this case, however, the schedules were not filled out correctly.

The attorney for the debtors testified that prior to the meeting of creditors he would estimate that he had not spent in excess of two hours discussing the petition with the debtors. The debtors testified that the schedules were reviewed, questions asked, and information taken by a secretary.

The proof is clear that counsel knew that the debtors had transferred $4,500.00 to Mr. Dolbe immediately prior to filing petitions in bankruptcy. Counsel testified it was his understanding that the debtors were holding the money in trust for Mr. Dolbe. Admittedly, because the money had been transferred by the debtors prior to the filing of the petition it accordingly would not have been listed in answer to question 6 in the statement of affairs ("What property do you hold for any other person?"). However, no explanation was offered as to the failure to list this transaction in answer to question 12(b) in the statement of affairs ("Have you made any other transfer, absolute or for the purpose of security, or any other disposition, of real or tangible property during the year immediately preceding the filing of the original petition herein?").

Testimony was offered at the trial and at the deposition regarding the sale of property in Florida and the sale of the jewelry stores in Pikeville and Dunlap. The timing of these transactions is not entirely clear. The testimony was clear that counsel knew of the sale of the two jewelry stores, however, the only mention of the transactions was in the business petition on Schedule B–2(1) under "1. Inventory" that the "Pikeville & Dunlap stores owners have gone bankrupt—Trustee has inventory." Under "p. Other liquidated debts owing debtor" it was stated there was a

> note from Alfred A. and Linda R. Kalstek to Steve & Linda Ayers, due $11,500.00 8/15/78 sec. by Sec. Agree. and unrecorded D.T. on land in 2d C.D. Hamilton Co., TN; Sec. int. in Dunlap store sec. by note from Sherley B. Layton to Steve Ayers for $32,000.00.

Counsel testified that he knew the debtors had some cash accumulated but did not know in what amount. The evidence clearly shows that the debtors asked their attorney what they could and could not do with regard to spending their accumulated cash. The fact that the debtors were able to pay counsel $1,200.00 as a retainer fee was an additional indication that the debtors had access to some significant amount of money. Also, the nature of the debtors' business would indicate the cash flow of the

business was substantial. Counsel discussed with the debtors their making large purchases for the family, taking trips to Florida and Gatlinburg, sending a rather large amount of money to Mr. Dolbe and wanting to set aside money for their son to go to college. It is hard to believe that such discussions in total (or any one discussion) would not have aroused some question in the mind of the attorney as to the amount of cash the debtors had accumulated and were spending. Counsel testified he did not know the amount accumulated or spent and did not tell the debtors to record their expenditures because he felt an accounting of the expenditures was not relevant at the time and that the necessary figures would be pulled together and put in the schedules when the bankruptcy petition was filed. However, the "pulling together" obviously was not done.

In the case of *In re Soroko,* 34 F.Supp. 825, 826 (S.D.N.Y.1940) the court held that

the statement of the facts by a bankrupt to his attorney may be a full and fair disclosure, such as will negative any fraudulent intent upon the part of the bankrupt, if the bankrupt stated all the facts which he and his attorney *believed* to be relevant. Ignorance of the law on the part of the bankrupt and his attorney may lead the attorney to advise his client without a knowledge of relevant information in the possession of the client. This may result in the bankrupt's statements under oath being false, but it does not itself render the statement intentionally false. (Emphasis added.)

It should be noted that during the depositions and hearing the debtors answered all of the questions propounded to them and in many instances offered information that was not required by the question and that would not otherwise have been discovered. In the case of *Verran v. Isaacs,* 1 B.D.C. 157 (E.D.Tenn.1974) (B.J.), Judge Bare cited *Huntley v. Snider, Trustee,* 88 F.2d 335, 33 ABR (ns) 639 (1st Cir.1937) for the following rule of law:

The offense of fraudulent concealment under 18 U.S.C. 152 is complete when the

bankrupt has failed to disclose the property to his trustee after having had reasonable opportunity to do so.

The court went on to state that although the bankrupt had been careless and negligent in failing to disclose the possible interest in property either in the bankruptcy petition or during his testimony at the first meeting of creditors, the omission was not knowing and fraudulent concealment. The court emphasized the bankrupt's readiness to disclose the facts regarding the property when questioned by the trustee and stated that if the bankrupt had not answered the trustee's questions, the "decision reached would be different".

In a case concerning exemptions, *In re Gregory,* BK. No. 75–632 (M.D.Tenn.1975) (B.J.), this court held:

As a shorthand rule, assets not heretofore scheduled, but brought to light by the voluntary action of the bankrupt, may be regarded as presumptively not concealed with sufficient mens rea to invoke section 6. Accordingly, the court will presume mistake or error in the scheduling. . . .

Counsel's advice to the debtors with regard to converting nonexempt assets into exempt assets was not altogether incorrect. In *Forsberg v. Security State Bank,* 15 F.2d 499 (8th Cir.1926), the bankrupt while insolvent and in contemplation of bankruptcy sold nonexempt cattle and hogs and purchased exempt sheep and other personal property to obtain additional exemption under the state exemption laws. The sale and purchase were made within four months before filing bankruptcy. The court, after stating that the exemption laws are to be liberally construed, held that it was legal to change non-exempt assets into exempt assets prior to filing bankruptcy. The court cited one of its earlier decisions, *Crawford v. Sternberg,* 220 F. 73, 135 C.C.A. 641 (10th Cir.1915), which found:

It is well settled that it is not a fraudulent act by an individual who knows he is insolvent to convert a part of his property which is exempt, for the purpose of claiming his exemptions therein, and of thereby placing it out of the reach of his creditors. (citing cases).

... This has become an established principle, because the statutes granting exemptions have made no such exception, and because the policy of such statutes is to favor the debtors, at the expense of the creditors, in the limited amounts allowed to them, by preventing the forced loss of the home and of the necessities of subsistence, and because such statutes are construed liberally in favor of the exemption.

15 F.2d at 501. *See also Chase v. Local Loan Co. et al.,* 141 F.2d 299 (7th Cir.1944); *In re White,* 221 F.Supp. 64 (N.D.Calif. 1963).

The *Forsberg* court also quoted from another of its earlier decisions, *First National Bank v. Glass,* 79 F. 706, 25 C.C.A. 151 (8th Cir.1897), which applied the same rationale to a bankrupt who had taken nonexempt assets and purchased a homestead:

An insolvent debtor may use with impunity an of his property that is free from the liens and the vested equitable interests of his creditors to purchase a homestead for himself and his family in his own name. If he takes property that is not exempt from judicial sale and applies it to this purpose, he merely avails himself of a plan provision of the constitution or the statute enacted for the benefit of himself and his family. He takes nothing from his creditors by this action in which they have any vested right. The constitution or statute exempting the homestead from the judgements of creditors is in force when they extend the credit to him, and they do so in the face of the fact that he has this right. Nor can the use of property that is not exempt from execution to procure a homestead be held to be a fraud upon the creditors of an insolvent debtor, because that which the law expressly sanctions and permits cannot be a legal fraud.

15 F.2d at 501. The *Forsberg* court, however, does recognize that there may be instances in which facts extrinsic to the conversion indicate fraudulent purpose. *See* 15 F.2d at 502. In that instance, the conversion might just be one step in a scheme to defraud, delay or hinder creditors and thus would be a bar to discharge. Such is not the case here.

However, there is a limit on converting nonexempt assets into exempt assets. In the case of *Butz v. Blue,* 3 C.B.C.2d 4, 5 B.R. 723 (Bkrtcy.Ct.S.D. Ohio 1980) the debtor attempted to change the beneficiary of his life insurance policy from his nondependent sister to his minor son. Under Ohio law, the life insurance policy would then have been exemptable by the debtor. The determinative factor in the court's holding that the nonexempt property could not be converted into exempt property was that the debtor attempted the conversion *after* the commencement of his bankruptcy petition and thus the rights of the trustee and creditors in the policy had already vested.

Despite the professed semantical niceties of abolishing the use of "title" concepts under the 1978 Bankruptcy Code, the trustee in bankruptcy and creditors take all of the "property of the estate" as defined under 11 U.S.C. sec. 541 in its full legal significance. This bundle of property rights vest upon "the commencement of a case". At this point of cleavage neither the debtor nor the creditors can elect to defeat these respective vested interests.

3 C.B.C.2d at p. 6, 5 B.R. 723. *See also In re Dardar,* 1 C.B.C.2d 1108, 1110 (Bkrtcy. Ct.E.D.Va.1980).

Additionally it is apparent the debtor cannot fraudulently obtain the property prior to filing and then convert the property so obtained into exempt property. For example, the debtor cannot buy goods on open account from a supplier with the intent the proceeds from these goods be converted into exempt property. *In re White, supra,* 221 F.Supp. at p. 66. There is absolutely no proof in this record that these debtors so acted.

The legislative history of the Code in strong language sanctions the conversion of nonexempt property into exempt property before the filing of a bankruptcy petition. "The practice is not fraudulent as to creditors, and permits the debtor to make full

use of exemptions to which he is entitled under the law." H.R.Rep. No. 95–595 at 361, U.S.Code Cong. & Admin.News 1978 pp. 5787, 6317.

In summary, the Code sanctions and the courts have held that it is legally correct to convert nonexempt assets into exempt assets prior to the commencement of a case. However, the problem in this case is that the debtors apparently were not instructed as to their exemption rights and limitations and thus, may have spent an amount of money in excess of their allowed exemption claims, a matter discussed infra. This however still does not bar the debtors' discharge since the necessary fraudulent intent has not been proven to the satisfaction of the court.

It is obvious to the court from the record that the debtors sincerely relied upon their counsel for advice in preparing their schedules in bankruptcy and for advice throughout the pendency of their petition. The court admits that it is difficult for someone knowledgeable of bankruptcy proceedings to understand how the debtors could have honestly believed that the Bankruptcy Code sanctioned some of their expenditures and actions. However, the debtors' reliance upon their attorney's advice and the debtors' confusion regarding the entire proceedings is evidenced by their insistence in keeping the schedules as originally filed even after omissions and errors had been pointed out to them.

In the case of *Cosner v. Braswell*, BK. No. 76–1593 (M.D.Tenn. Aug. 19, 1977) (B.J.) the court looked to the age, intelligence, experience and character of the bankrupt in making its determination of the debtor's intent and whether the debtor was actually relying on the advice of counsel. The debtors in the case at hand were not well educated. Their attorney testified that he found the debtors "relatively unsophisticated in the sense that sometimes you ask a question and you realize after a minute or two that he hadn't understood exactly what you were saying." The attorney further testified that, in their discussions concerning the schedules, he found no evidence of the debtors attempting to hide anything.

### B. The Dolbe Transaction

The court further finds that the debtors did not have the requisite intent to hinder, delay or defraud creditors when they transferred the $4,500.00 to Mr. Dolbe. The debtors' testimony regarding their motives in making the transfer was not contradicted nor was there any proof offered that they actually intended to hinder, delay or defraud creditors by the conveyance. The debtors' testimony that the money was not theirs, that they were holding the money for Mr. Dolbe, tends to negate intent to defraud. The attorney who prepared the debtors' petitions testified as follows:

A. Yes, and I would further state I understood in regard to the preference—I guess the name was Dolby or something like that—at the time we discussed that and they told me that was money they were holding in trust for him, that it was not their money, not loaned to them, and I told them very honestly if they returned it it would be a preference and kicked out.

. . . .

Q. (by Mr. Fulton) You mentioned this Dolbe transaction and it would be a preference. Why wasn't that listed on any of the petitions?

A. Because, as I understood the transaction, the information sheets do not require it. If I understood what happened, it would have been money held by a third party.

. . . .

Q. Is it your opinion as a bankruptcy attorney this was money held in trust and need not be listed on the petition?

A. Under the facts they gave to me it was not a loan.

Q. You feel it's funds held in trust, is that correct?

A. Yes, from what they told me and I have seen nothing to the contrary.

The debtors' testimony did indicate an intent to prefer. Indeed, the payment

was returned to the trustee as a result of a preference action filed by the trustee against Dolbe. In *In re Sloan,* BK. No. 75–1122 (M.D.Tenn.1976) (B.J.), this court noted that under § 14c(4) of the Act [the Act's equivalent to § 727(a)(2)(A) of the Code]:

> the mere preferential payment of a valid debt is not a statutory ground for the denial of discharge.
>
> . . . .
>
> To deny discharge under section 14c(4), the preferential transfer must have been made with the specific intent to hinder, delay, or defraud creditors beyond that implied by a preference. (citations omitted).

*See also Sonny's Inc. v. Davis,* 3 B.R. 525 (Bkrtcy.D.Md.1980); *In re Welsh,* 1 B.C.D. 1575 (S.D. N.Y. 1975); *In re Worley,* 47 F.Supp. 212, CCH Bankr.L.Reps. ¶ 54,069 (D.Neb.1942) (B.J.); Collier on Bankruptcy ¶ 727.02(3) (15th ed. 1981). Like the Act, the Code does not make a preference an objection to discharge. There is no element of moral turpitude connected with the giving of a mere preference.

The court finds that the $4,500.00 payment by the debtors to Mr. Dolbe within 30 days of filing of their petitions in bankruptcy was not a transfer made with the intent to hinder, delay, or defraud creditors and the plaintiffs' objections to the debtors' discharge on this ground is, therefore, dismissed.

### C. Books and Records

There was no testimony by the trustee plaintiff as to the books and records of the debtors which were kept by B & B Tax Service. In fact, the trustee offered very little proof as to the inadequacy of the books and records offered by the debtors except his testimony that he had a difficult time ascertaining the status of the business. Rule 407, F.R.B.P., places the burden of proof on the party opposing the discharge. The court in *Uniroyal v. Grimes,* BK. No. 75–1437 (M.D.Tenn.1976) (B.J.) stated:

> A showing of reasonable grounds for believing that the business transactions and financial condition of the bankrupt cannot be determined from the books and records surrendered by the bankrupt requires more than the bare assertion by counsel that the books at hand are inadequate. *In re Romano,* 196 F.Supp. 954 (E.D.Tenn.1961).

However, the trustee plaintiff asserts that the misdated $27,000.00 check and the absence of the January 1980 bank statement showing the $27,000.00 withdrawal is sufficient to prove that the debtors are guilty of hindering, delaying, and/or defrauding creditors. The court does not accept this argument. The bank processing stamp on the face of the check indicated that it was processed January 10, 1980, and the debtors' explanation that they mistakenly put "1979" rather than "1980" because of the recent change of year is reasonable. The cancelled check was given to the trustee at the same time as the bank statements for the 8 or 9 months preceding January 1980 and the statement for February 1980. The debtors cannot be held to have assumed that the trustee would not check the processing date by the bank especially in view of the large amount of the check and the fact that the January 1980 statement was obviously missing. The January 1980 statement was received by the trustee on April 24, 1980, after the deposition taken by counsel for Everwed.

Exhibit Q is the debtors' list of expenditures of the $27,000.00. This list was supplied to the trustee at some time after the deposition on April 22, 1980. As discussed *supra* the debtors' attorney testified that he told the debtors not to keep a record of their personal expenditures immediately preceding the filing of their bankruptcy petition because it was not "relevant" and the figures would be pulled together and put into the bankruptcy petition at a later time. Exhibit Q was reconstructed by the debtors from memory and from contacting businesses and people to whom they had paid money during the months in question after being instructed by opposing counsel that such a list was indeed necessary. Admittedly, the list of expenditures is not in

the greatest of detail, but the court feels that the debtors' lack of more complete records of their recent expenditures is justified under the circumstances. As stated by this court in *In the Matter of Brown*, BK. No. 72–930 (M.D.Tenn.1974) (B.J.):

> Whether the bankrupt's failure to keep books should bar a discharge is a question in each case of the reasonableness under the particular circumstances. The failure to keep records is not an absolute bar to a discharge but it is only when the Referee finds that failure to keep records was not justified under the circumstances that he is warranted in entering an order refusing to grant a discharge. *Kansas Fed. Credit Union v. Neimeier*, 227 F.2d 287 (10th Cir.1955). If the bankrupt has failed to keep books, the bankrupt bears the burden of proof on the issue of the justification for his failure to keep such books. *In re Halpern*, 387 F.2d 312 (2nd Cir.1968); *Burchett v. Myers*, 202 F.2d 920 (9th Cir.1953).

*See also Waldschmidt v. Jones*, BK. No. 78–31885 (B.Ct.M.D.Tenn.1980); *Uniroyal v. Grimes, supra.* The trustee plaintiff's objection to discharge is dismissed.

Because the court has determined none of the plaintiffs' objections to the discharge of the debtors to be well founded, the court grants the debtors their discharge. The court must now determine the issues of nondischargeability of the debt to First National Bank of Pikeville and the trustee's objections to the debtors' exemptions.

## II. DISCHARGEABILITY OF DEBT TO FIRST NATIONAL BANK OF PIKEVILLE

Plaintiff, First National Bank of Pikeville, Tennessee (Bank), filed its amended complaint seeking nondischargeability of its debt owed by the Ayers pursuant to 11 U.S.C. § 523(a)(2). At the hearing on this and related matters, the Bank requested and received leave of the court to amend its complaint to allege subsections (4) and (6) of § 523(a) as further grounds for nondischargeability of the debt.

The debt in question was incurred in March, 1979, when the debtors purchased a 1978 Ford Mustang. It is not disputed that the purchase money for the automobile was obtained from the Bank and that the transaction was handled by telephone with Mr. Roberson, a Bank officer. Mr. Roberson testified that Steve Ayers called and stated that he desired to purchase the automobile and that he (Mr. Roberson) told him to write a check and thereafter bring in the documents so that a security agreement and note could be drawn. On or about March 26, 1979, the Ayers signed a security agreement and an installment note for the purchase money. Both documents noted that the loan was secured by a lien on a 1978 Ford Mustang, Serial No. 8F03F152914P2. The total amount loaned was $7,097.40 and was to be paid in 36 monthly installments of $197.15 beginning April 26, 1979. The Bank did not obtain a certificate of title with their lien noted on it. It is the Bank's position that as a condition to the loan, Steve Ayers agreed and promised to note the lien on the certificate of title or application for the certificate of title to be registered with the State of Tennessee in order to perfect the Bank's lien. The Bank officer testified further that "apparently the title came into the Bank" because this was the only way they would have been able to obtain some of the information which was in the Bank's records. There was no testimony by the Bank officer that the Bank told Ayers to obtain the title and note the Bank's lien. Ayers positively testified that the Bank did not request that he place a lien against the vehicle and note the same on the title. The car was sold in June, 1979.

The Bank alleges that the defendants, by virtue of the security agreement, agreed not to "further encumber, conceal, remove, sell, or otherwise dispose of the same without the written consent of the Lender." Defendant testified in his deposition taken October 1, 1980, (Exhibit No. M) that he sold the car because he needed money to pay for some of his store's inventory. Defendant testified that he did not really understand the legal aspects of a security agreement but did know generally what

one was. He testified that he thought he had been loaned the money on his name and that he had not given the Bank a security interest in the car. Both Mr. Ayers and Mr. Roberson testified that Mr. Ayers had had several loans with the Bank although there is some dispute as to whether these loans were related to cars. It was not disputed that some of the loans with the Bank were unsecured. Defendant further testified that he probably did not read the security agreement before signing it. The Bank officer testified that although the car had been sold in June 1979 the defendants were current on all payments on the loan through December 1979.

The issue before the court is whether or not the facts herein stated are sufficient within the statutory language so as to render the debt nondischargeable. The burden of proving that a debt comes within the exceptions of § 523 is on the creditor seeking to except its debt from discharge. The § 523(a) exceptions are to be liberally construed in favor of the debtor. *McLemore v. Simpson County Bank (In re Krulik)*, 6 B.R. 443, 448 (Bkrtcy.M.D. Tenn.1980).

The Bank alleges that its debt should be excepted from discharge by virtue of § 523(a)(2)(A), § 523(a)(4), and/or § 523(a)(6). Each section will be discussed separately.

### A. Section 523(a)(2)(A)

Section 523(a)(2)(A) provides:
A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition; ....

In *McLemore v. Simpson County Bank, supra* at p. 448, this court held that in order for the objecting creditor to have its debt excepted from discharge under § 523(a)(2)(A), the creditor must show the following:
(a) that the debtor made the false representations;
(b) that at the time of making them, he knew that they were false;
(c) that he made them with the intention and purpose of deceiving the creditor;
(d) that the creditor relied on such representations; and
(e) that the creditor sustained the alleged loss and damage as a result of the representations having been made. [citations omitted].

It is the Bank's position that the loan would not have been made but for Steve Ayers' representations that he would note the Bank's lien on his application to the State of Tennessee Division of Motor Vehicles for a certificate of title to the automobile, thereby perfecting the Bank's security interest in the automobile. It is Mr. Ayers' position that he was not told to note the lien on the title and that he thought the loan was unsecured and the automobile unencumbered.

Although the Bank's position as stated previously, is that the Bank required Ayers to note the lien on the title of the automobile, there was no testimony that Ayers ever represented that he had indeed noted the lien on the application for certificate of title to the automobile. At best, the Bank's proof showed that Mr. Ayers was asked (or told) to note the lien on the title. Bank's counsel erroneously stated in his brief that in order to bring its debt within the § 523(a)(2)(A) exception, "The Court must find that the Bank demanded and the debtors agreed to note the lien of the Bank on the application for title." It is well established that the false representations prohibited by § 523(a)(2)(A) must be representations of a past or existing fact; a mere promise or representation of intention to act is insufficient. Collier on Bankruptcy ¶ 523.08(4) (15th ed. 1981). Thus, even if Ayers had promised the Bank that he would note the lien on the title, that promise would not be a false representation under § 523(a)(2)(A).

As indicated, *supra,* the element of reasonable reliance is an indispensable part of a nondischargeable claim under the Code. *Matter of Wise,* 6 B.R. 867 (Bkrtcy.Fla. 1980); *In re Nichols,* 6 B.R. 842 (Bkrtcy. Me.1980). The Bank's proof also did not establish that the Bank relied upon Ayers' representations, if any, in approving the loan to Ayers. The following is an excerpt from the cross-examination testimony of Mr. Clay Roberson, loan officer and Vice President of the Bank:

Q. And you were primarily relying on the prior loans to Ayers when you told him to go ahead and write the check and come in later?

A. Sure. His character would have to be considered, yes.

. . . .

Q. It was really pretty normal banking practice isn't it for a man that you trust to say I am going to buy a car today, I don't have enough money and you tell them go ahead and write the check and we will fix the check later?

A. That's the normal procedure for good customers.

Q. And that's the way you did it here?

A. Yes, uh huh.

From the foregoing it appears that the Bank relied on its past dealings with Ayers rather than any statements Ayers may have made regarding his intention to note the lien on the title. The entire loan transaction was completed in a matter of minutes over the telephone. The Bank officer apparently approved the loan during the telephone conversation since he testified that he told Ayers that he could go ahead and purchase the automobile and the loan papers could be signed at a later time. *See U.S. Life Credit Corp. v. Ducote,* 4 B.C.D. 943 (W.D.La.1978) (B.J.). Mr. Roberson further testified that at the time of the telephone conversation he was under the impression that Mr. Ayers had not yet purchased the automobile; therefore, Mr. Ayers could not have possibly falsely represented that he was at that time noting the lien on the title or had noted the lien on the title. It is well established that if the con-

sideration for the loan was secured prior to the making of the false representations, any subsequent fraud will not render the debt nondischargeable. *Byrd v. Byrd,* 4 B.D.C. 205, 9 B.R. 357 (Bkrtcy.D.C.1981); *In re Nichols, supra; In re Schartner,* 7 B.R. 885 (Bkrtcy.Ohio 1980); *In re Beaver,* 6 B.R. 523 (Bkrtcy.Or.1980). *See Terra Eastern Corp. v. Younce,* 2 B.C.D. 1432 (W.D.Wis. 1976) (B.J.).

The Bank also failed to prove that Ayers had the requisite intent to deceive the Bank at the time of the loan transaction. The issue of intent is a fundamentally factual inquiry. *Commerce Union Bank v. Yates,* Adv.Proc. No. 380–0202 (B.Ct.M.D.Tenn. 1980). In *Commerce Union Bank v. Yates,* this court stated:

As a practical evidentiary matter, actual fraudulent intent may not be susceptible of direct proof. A showing of circumstances so suspect as to compel the inference of actual fraud, therefore, may be sufficient. (citations omitted).

The preponderance of the evidence does not establish that Ayers, at the time he received the loan proceeds, did not intend to repay the loan debt. In fact, the Bank's officer, Mr. Clay Roberson, testified that at the time the bankruptcy petition was filed, all payments on the loan debt were current.

Based upon the foregoing, it is clear that the Bank has failed to prove that its debt should be held nondischargeable under § 523(a)(2)(A). Rule 407, F.R.B.P.

### B. Section 523(a)(4)

Section 523(a)(4) has also been alleged by the Bank to be a ground for excepting its debt from discharge. That section provides:

A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny; . . . .

It is clear from the pertinent legislative history of § 523(a)(4) that "while acting in a fiduciary capacity" only qualifies "fraud

or defalcation." *Quarles Oil Company, Inc. v. Williams*, 2 C.B.C.2d 796, 801 (B.Ct.W.D. Va.1981) *citing* Collier on Bankruptcy ¶ 523.14[1]. Thus, section 523(a)(4) provides for the exception of three separate and distinct types of debts: 1. debts for fraud or defalcation while acting in a fiduciary capacity; 2. debts for embezzlement; and 3. debts for larceny.

This section was not discussed by Bank's counsel in its brief to the court nor was there any testimony during the trial of this cause which indicated the applicability of this section to the facts of the case at bar. Plaintiff's counsel argues in his brief that because of the debtor's prior business experience, "debtor cannot be heard to say that he was unaware that it [the security agreement] imposed a duty upon him to protect and preserve the creditor's collateral." In *Borg-Warner Acceptance Corp., et al. v. Miles, et al.*, 2 C.B.C.2d 892, 5 B.R. 458 (Bkrtcy.E.D.Va.1980), the court accurately stated:

> The term "fiduciary" has been consistently construed as limited to express trusts and not to trusts imposed because of an act of wrongdoing out of which the debt arose, or to trusts implied by law from contracts. The Courts have attempted to avoid making the exception so broad that it reaches such ordinary commercial relationships as creditor-debtor and principal-agent. *Matter of Angelle*, 610 F.2d 1335 (5th Cir.1980); *Matter of Dloogoff*, 600 F.2d 166 (8th Cir.1979); *In re Harris*, 458 F.Supp. 238 (D.Or.1976); *In re Harrill*, 1 B.R. 76 (E.D.Tenn.1979). Id., p. 895, 5 B.R. 458.

*See also In re Thornton*, 544 F.2d 1005 (9th Cir.1976); *In re Burchfield*, 31 F.2d 118 (D.C.W.D.N.Y.1929); *National Bank of Detroit v. Olson*, 3 C.B.C.2d 822 (B.Ct.E.D.Wis. 1981).

■ A constructive trust or a trust implied from terms of a contract or agreement is insufficient to create a fiduciary relationship under this exception. *In re Angelle, supra; National Bank v. Olson*, 3 C.B.C.2d 822 (B.E.D.Wis.1981); *Borg-Warner Acceptance Corp. et al. v. Simmons*, 9 B.R. 62 (Bkrtcy.Ct.S.D.Fla.1981). Also, this court has held that a debtor's sale of collateral in contravention of the terms of the security agreement which may violate the Tennessee breach of trust statute does not constitute a breach of an express or technical trust. *In re McCloud*, 7 B.R. 819, 3 C.B.C.2d 701, CCH Bankr.L.Rep. ¶ 67,818 (Bkrtcy.M.D.Tenn. 1980); *Borg-Warner Acceptance Corp. v. Binkley*, BK No. 79–30291 (B.Ct.M.D.Tenn. 1980). Courts have held that the requisite trust of fiduciary relationship must exist before the incident creating the contested debt and apart from it. *Matter of Wise, supra.* "It is not enough that the trust relationship spring from the act from which the debt arose." *In re Paley*, 3 C.B.C.2d 648, 8 B.R. 466 (Bkrtcy.E.D.N.Y.1981) *citing Davis v. Aetna Acceptance Co., supra*, and *Matter of Dloogoff, supra. See Hurlbert v. Drake*, 6 B.C.D. 662, 5 B.R. 149 (Bkrtcy.Idaho 1980). There is nothing in the record to indicate that a trust of any sort was in existence or contemplated by the parties before, during or after the transaction at hand. Clearly, the relationship between the parties in this case was that of a debtor/creditor.

Neither a charge of larceny nor embezzlement is applicable to the case at bar. Both terms refer to tangible property rather than to intangible property interests. The terms are defined in Collier on Bankruptcy, ¶ 523.14[3] (15th ed. 1981) as follows:

> Embezzlement is the fraudulent *appropriation* of property by a person to whom such property has been *entrusted,* or *into whose hands it has lawfully come.*
>
> . . . .
>
> Larceny is the fraudulent and wrongful *taking* and *carrying away* the property of another with intent to convert such property to his (the taker's) use without the consent of the owner. *Id.* (footnote omitted) (Emphasis added).

*See also Quarles Oil Company, Inc. v. Williams, supra* at p. 801; *American Family Ins. Group v. Gumieny*, 3 C.B.C.2d 834, 8 B.R. 602 (Bkrtcy.E.D.Wis.1981). The only tangible property of the Bank concerned in this matter was the loan proceeds which

were obtained by the Ayers through a bona fide loan transaction. The use of the loan proceeds to purchase the 1978 Ford Mustang was contemplated by both parties at the time of the loan transaction. Clearly the subsequent sale of the automobile is which the Bank held a security interest was not an act of larceny or embezzlement.

### C. Section 523(a)(6)

Plaintiff Bank alleges also that its debt falls within the exception of § 523(a)(6) and is thus a non-dischargeable debt. Section 523(a)(6) provides:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

█ It is the Bank's position that the sale of the 1978 Ford Mustang without the Bank's consent and without paying over the proceeds of the sale to the Bank was an act of conversion by the debtors. The Bank further asserts that such conversion was willful and malicious. The debtors contend that the automobile was sold because money was needed for the business and because Mr. Ayers believed the automobile to be unencumbered.

"Injury" is a broad term which encompasses damage or destruction to tangible property as well as to intangible property interests or personal rights. Collier on Bankruptcy ¶ 523.16[1] (15th ed. 1981). It is well established that the phrase "willful and malicious injury" includes willful and malicious conversion. 124 Cong.Rec. H 11,095–6 (daily ed. Sept. 28, 1978); S. 17,- 412–13 (daily ed. Oct. 6, 1978); *McLemore v. Simpson County Bank, supra;* Collier on Bankruptcy ¶ 523.16[3] (15th ed. 1981).

Plaintiff's counsel relies on *First National Bank v. Duranti,* 1 B.R. 54, 5 B.C.D. 841 (W.D.Wis.1979) (B.J.) as authority for the principle that "A sale which had the effect of placing collateral securing a loan out of the reach of the creditor without compensating the creditor for its collateral was conversion." (Plaintiff's Brief, p. 7). How-

ever, this court in *In re McCloud, supra,* held that although a debtor's sale of his creditor's collateral may be improper, the sale is not a conversion unless:

1. The debtor's disposition of the collateral was unauthorized;

2. The creditor was entitled to immediate possession of the collateral at the time of the disposition;

3. The creditor · was not aware of any, likelihood that its collateral would be sold, or, if aware of such likelihood, the creditor had taken reasonable steps to protect its security interest;

4. The creditor was not aware that its collateral had in fact been sold in violation of the terms of the security agreement.

*See also Borg-Warner Acceptance Corp. v. Binkley,* BK No. 79–03029 (B.Ct.M.D.Tenn. 1980).

In the instant case, the sale of the 1978 Ford Mustang was clearly unauthorized by the Bank. Paragraph 4 of the Security Agreement (Exhibit 1) provided that the debtor covenanted and agreed not to "further encumber, conceal, remove, sell or otherwise dispose of the same [1978 Ford Mustang] without the written consent of the Lender." Also, there is no proof that the Bank knew of any likelihood that the automobile would be sold or that it had in fact been sold by the Ayers. The determining factor is that the Bank was not entitled to immediate possession of the collateral at the time of the disposition of the collateral by the debtor. Unlike *In re McCloud,* the Bank's security agreement did not provide for default upon any unauthorized disposition of collateral. Moreover, the Bank's officer testified that the debtors were current in their loan payments up to the date of the filing of their bankruptcy petition. Therefore, in keeping with *In re McCloud,* this court finds that there was no conversion.

█ Although the debtors are not herein found to be guilty of conversion, the Bank very possibly suffered an injury insofar as the sale of the collateral impaired the

Bank's security interest in the collateral. *See First National Bank v. Duranti, supra* 1 B.R. at p. 56, where the court made the following statements:

> Certainly the disposal of the collateral from which the Bank was entitled to seek repayment upon default constituted an immediate and direct injury to the Bank. The Bank's failure to perfect its lien prior to the disposal of the collateral is irrelevant to the injury. Although the Bank by failing to perfect its security interest may not have prevailed against a trustee in bankruptcy or a subsequently perfected creditor, no trustee in bankruptcy was acting nor any competing creditor claiming an interest in the property at the time of the disposal.

Whether there is indeed injury in this case is debatable since at the time of disposition of the collateral the Ayers were current in their payments on their indebtedness to the Bank and thus there was no default until the payments stopped which was after the filing of the bankruptcy petition. There could be no injury to the Bank after the filing of the bankruptcy petition since its security interest was not perfected and would be subject to the avoiding powers of the trustee. The court does not herein determine whether the Bank was injured in such a manner as contemplated by § 523(a)(6) since neither counsel has raised this particular question and because this objection can be disposed of on another basis to be discussed *infra.* It is sufficient, therefore, to state only that this court acknowledges that willful and malicious injury to property interest includes, *but is not limited to,* willful and malicious conversion. It is conceivable that there may be situations in which the acts of a debtor do not meet the stringent *McCloud* test for conversion, but still constitute willful and malicious injury to the property interests of another entity.

In order to come within the exception provided in § 523(a)(6), a creditor must prove that the debtor's conduct was willful and·malicious. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 363 (1977); S.Rep. No. 95–989, 95th Cong., 1st Sess. 77–79 (1978), U.S.

Code Cong. & Admin.News 1978, p. 5787; *In re McCloud, supra; McLemore v. Simpson County Bank (In re Krulik), supra; Hartwig v. Ankowiak,* 3 C.B.C.2d 964, 9 B.R. 746 (Bkrtcy.N.D.Ill.1981); *West Springfield M.F. Credit Union v. Finnie,* 10 B.R. 262 (Bkrtcy.Mass.1981); *Liberty Nat'l Bank & Trust Co. v. Hawkins,* 6 B.C.D. 1054, 6 B.R. 97 (Bkrtcy.M.D.Ky.1980). Thus the act must have been deliberate or intentional and in knowing disregard of the rights of another. *In re McCloud, supra.*

▮ Clearly the sale of the automobile was intentional and deliberate. However, it is not clear that the resulting injury, if any, to the Bank's security interest was an intentional or deliberate result of the sale. As stated previously, the debtors sold the car because they needed money for their jewelry business. However, the Bank has failed to prove that the debtors sold the automobile with knowing disregard to the Bank's rights. Plaintiff's counsel stated that "Factually this case [*First National Bank v. Duranti, supra*] is on all fours with the facts herein." The court disagrees. In *First National Bank v. Duranti, supra* at p. 56, a finding of willfulness and maliciousness was required by the following sequence of events:

1. In September or October of 1975, the debtor (Duranti) asked the Bank for its permission to sell the Bank's collateral and assign his obligations under the note and security agreement to a third party;

2. The Bank refused to permit the requested sale and assignment;

3. In October of 1975, the debtor sold the collateral and did not inform the Bank;

4. For a period of two years (October 1975 until November 1977) the debtor had conferences with the Bank's agents concerning past due payments. During these conferences, the Debtor responded to questions in a manner such that the Bankruptcy Court found the answers were "intended to obscure or disguise from the Bank the fact that he had disposed of the collateral."

The facts in the instant case do not so clearly require a finding of maliciousness or "knowing disregard of the rights of another." Mr. and Mrs. Ayers both testified that they did not remember reading the security agreement before signing it. Mr. Ayers insists that he thought he had bought the car on his name and that the Bank had given him an unsecured note. In Mr. Ayers' deposition taken October 1, 1980, (Exhibit No. M) Mr. Ayers testified that he did not give the automobile title to the Bank "because I bought other cars previously through them and they never did ask for the title." (p. 20). The testimony of Mr. Clay Roberson, the Bank's officer, regarding whether the title was ever in the Bank's possession is somewhat confusing. Although Mr. Roberson testified that the certificate of title was required before the loan would be made, he also testified that when Mr. Ayers called about the loan to purchase the automobile, Mr. Roberson "told him to go ahead and write the check and bring me the title to the car and come on in." When asked whether the certificate of title had ever been brought into the Bank, Mr. Roberson testified:

A. The certificate of title we would have received it because we would have gotten the numbers off it. Apparently it would have come into the Bank, or the bill of sale.

The automobile was sold in June, 1979, and the debtors continued to make payments on the vehicle through the end of 1979.

Plaintiff's counsel states in his brief (p. 7) that the Court in *First National Bank v. Duranti, supra,* found that:

2. The fact that such conversion was wilful and malicious was shown by debtors' failure to inform creditor of sale and debtor's continuation of contract payments to creditor as if relation were unchanged;

Plaintiff relies on the foregoing in support of its argument that the debtors' continued payments on the vehicle through the end of 1979 shows that the debtors' conduct was willful and malicious. However, this court held in *Murfreesboro Production Credit Assoc. v. Harris,* 7 B.C.D. 437, 8 B.R. 88, p. 94 (Bkrtcy.M.D.Tenn.1980) that continued payments on indebtedness previously secured by the collateral which had been sold rebutted "even an inference that, by using the proceeds from sales of the plaintiff's collateral to pay creditors other than the plaintiff, the debtors intended to effect a willful and malicious conversion of the plaintiff's security interest." *See also In the Matter of Dechesne,* 1 B.C.D. 1096 (D. RI 1975) (B.J.). In *West Springfield M.E. Credit Union v. Finnie, supra,* the court determined that the fact that the debtor remained current in all his loan payments for at least one year after he sold the truck and up to the date he filed for bankruptcy indicated that the debtor did not have the requisite intent to harm the Credit Union by selling its collateral. The court further stated that the debtor probably acted out of ignorance or expedience but "at all times had every intention of repaying his loan balance." *Id.* 10 B.R. at p. 264.

Plaintiff also argues that through his experience in the jewelry business and auction business Mr. Ayers should be sufficiently familiar with security agreements to understand the effect of selling the collateral. Mr. Ayers testified that he does not use security agreements in his business either with his creditors or customers. (Deposition, 10/1/80, p. 26). In *Hippodrome Oldsmobile v. Hammond,* Adv.Proc. No. 380–0434 (B.Ct.M.D.Tenn.1980) this court held that although the debtor's conclusion that his automobile was unsecured was "totally and completely erroneous and ... indeed difficult for an attorney or parties trained in automobile financing and title concepts to accept," such a conclusion by the debtor was not unreasonable in light of the fact that the debtor was not a person trained in automobile financing and title concepts. In *West Springfield M.E. Credit Union v. Finnie, supra* 10 B.R. at p. 263, the court held that although the debtor sold used cars as a means of supplementing his income, that still did not impute to him sophistication in financing and title matters.

Based upon the foregoing, this court holds that the debt to First National Bank of Pikeville, Tennessee is dischargeable.

## III. OBJECTIONS TO EXEMPTIONS

██ The court finds the most difficult questions presented in this case to be those regarding exemptions. The trustee asserts exemptions should be denied because the debtors have been guilty of fraud. The debtors have failed to claim certain property exempt which could have been claimed exempt. Other property is not dealt with as specifically as it should have been. Certain property was purchased after the filing with funds held before filing but not claimed exempt. Other property was discovered by the trustee which had not been claimed exempt. A portion of money was used for both pre and post filing living expenses.

We will consider three groups of property: (1) the $27,000 previously discussed or property purchased with these funds; (2) $14,000 received from the sale of debtors' house; and (3) various household goods and jewelry. The property and the claim of exemptions must be dealt with in the context of this court's decision in *In re Brewer,* 17 B.R. 186 (Bkrtcy.M.D.Tenn. 1982), *aff'd* 22 B.R. 983 (M.D.Tenn.1982). In that case it was determined that the debtor's claim of exemptions becomes final 15 days after the meeting of creditors unless property is newly discovered after the schedules are originally filed.

The debtors' claim of exemption was under 11 U.S.C. § 522(d). The applicable provisions are as follows:

(1) The debtor's aggregate interest, not to exceed $7,500 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence....

(2) The debtor's interest, not to exceed $1200 in value, in one motor vehicle.

(3) The debtor's interest not to exceed $200 in value in any particular item, in household furnishings, household goods, wearing apparel, appliances, books, animals, crops or musical instruments, that are held primarily for the personal, family, or household use of the debtor or a dependent of the debtor.

(4) The debtor's aggregate interest, not to exceed $500 in value, in jewelry held primarily for the personal, family, or household use of a debtor or a dependent of the debtor.

(5) The debtor's aggregate interest, not to exceed in value $400 plus any unused amount of exemption provided under paragraph (1) of this subsection, in any property.

. . . .

(9) Professional prescribed health aids for the debtor or for a dependent of the debtor.

(10) The debtor's right to receive—

(A) A social security benefit....

### A. Trustee's Argument as to Denial of Exemptions.

██ The trustee asserts that the debtors should be denied the exemptions claimed on Schedules B–4 of both Chapter 7 petitions in bankruptcy, case number 280–00369 and case number 280–00370, "because the Plaintiffs herein have proved by clear and convincing evidence that the Debtors herein are guilty of actual fraud." (Supplemental Brief of Trustee in Bankruptcy, p. 5). As stated *supra,* the court has not found that the plaintiff's have proved that the debtors are guilty of fraud and, accordingly, the court dismisses the trustee's request for denial of exemptions on that ground. The court would also dismiss the trustee's objection on the basis that the alleged actual fraud was unrelated to the exemptions.

Where it can be shown that the debtor has in some manner caused the removal of or has secreted a part of his property so that it has not been or cannot be recovered, or where its disappearance is not satisfactorily explained, it has been held by some court that such conduct forfeits all right to exemptions. (Citations omitted)

. . . .

Some courts however, have not accepted this rule. (Citations omitted).

In light of the strong exemption policy of the Code, the latter group of cases should be followed. The grounds for denial of discharge include removal of assets, and that should be the sole remedy. Exemption(s) are not treated by the Code as a "carrot on a stick" and the families of even dishonest debtors need support and should not become charges upon the state. Collier on Bankruptcy ¶ 522.08 fn. 10 (15th ed. 1981). The court further concludes that 11 U.S.C. § 522(g) is inapplicable in this proceeding since the debtors are not attempting to claim exempt any property which the trustee has recovered.

The trustee's general objection is overruled.

### B. The $14,000 Homestead Exemption

Each debtor claimed $7500 homestead exemption pursuant to 11 U.S.C. § 522(d)(1). The house was sold and approximately $14,000 of equity realized. This amount was properly allowable as exempt. Of this amount $9100 was attached by the trustee after the deposition on April 22, 1980. The money should be released except as hereinafter noted.

### C. Expenditure of the $27,000 and the Exemption of that Property

Exhibit "Q" to this proceeding was the debtors' recapitulation of the expenditure of the $27,000 previously discussed. In summary, the expenditures are as follows:

(1) Payment to Doug Dolbee (the actual payment was $4500 and has been recovered by the trustee.) — $4700

(2) Payment to lawyer for the bankruptcy petition — $1200

(3) Fiat automobile ($1150 plus $550 repairs) — $1700

(4) 1976 Chevrolet automobile — $1530

(5) Business Expenses

| | | |
|---|---|---|
| Wages | 400 | |
| baby sitting | 300 | |
| fuel | 100 | |
| sales tax | 1613 | |
| adding machine | 50 | |
| brief case | 45 | |
| rent | 500 | |
| utilities | 137 | |
| | | $3155 |

(6) Living Expenses

| | | |
|---|---|---|
| food | 1200 | |
| doctors | 682 | |
| glasses | 250 | |
| clothing | 1600 | |
| gasoline | 900 | |
| rent | 1350 | |
| utilities | 321 | |
| school lunches | 120 | |
| | | $6473 |

(7) Florida Expenses

| | | |
|---|---|---|
| air fare family | 550 | |
| motel | 700 | |
| food | 420 | |
| fishing trip | 300 | |
| auto parking (airport) | 140 | |
| car rental | 240 | |
| air fare— return for job | 550 | |
| motel-food job search | 450 | |
| | | $3350 |

(8) Miscellaneous

| | | |
|---|---|---|
| motel-Cookeville | 110 | |
| motel-Gatlinburg | 175 | |
| bus fare | 60 | |
| child support | 800 | |
| | | $1145 |

The court does not find the business or living expenses improper. Although the Florida trip was both pleasure and job related, and it is apparent the parties were not miserly on this trip, a job search in Florida was not shown to be unreasonable. Although certain of the expenses are subject to criticism, it is the determination of the court that neither the Florida expenses nor the miscellaneous expenses violated the Code provisions.

### 4. Exemptions Claimed or Omitted

Steve Ayers listed a 1969 Fiat as exempt and claimed equity of $1200 in the car, pursuant to the motor vehicle exemption in § 522(d)(2). Linda Ayers did not take advantage of § 522(d)(2) although on her Schedule B–2—Personal Property (f) Automobiles, Trucks, and other vehicles, the following is shown:

| | |
|---|---|
| 1978 Ford Fiesta | $3,300.00 |
| 1974 Chrysler | 800.00 |
| 1969 Fiat | 1,200.00 |

On Schedule A–2—Creditors having security, a debt to First National Bank, Sparta, Tn 38583, in the amount of $3,300.00 is

shown to be secured by the 1978 Ford Fiesta and 1974 Chrysler. Thus, there appears to be $800 equity not claimed exempt in the two automobiles. The unclaimed equity of $800.00 must be paid to the trustee. If no security agreement exists, the automobiles must be turned over to the trustee. It also appears from Exhibit Q that a 1976 Chevrolet was bought for $1,530.00. The proof at trial showed that this automobile was purchased with non-exempt assets subsequent to the filing of the bankruptcy petitions. As discussed *supra*, non-exempt assets may not be converted into exempt assets once the case has been commenced. Thus, $1,530.00 should be available to the trustee.

The debtors each claimed $350.00 exemptions in wearing apparel. A total of $1,600.00 was spent on clothing for the family. Although it is unclear exactly when these purchases were made, the testimony indicates that the purchases were made prior to the filing of the petition. Thus, these expenditures were for the purpose of changing non-exempt assets into exempt assets which, as discussed *supra*, is legally correct. The proof is insufficient to determine the fair market value of the clothing held by the debtors. The court will assume the claimed amount is the fair market value at the time of filing.

■ Mr. Ayers also filed exemption claims with regard to the debtors' household goods and furnishings pursuant to § 522(d)(3). Linda Ayers did not file any exemption claim to household goods or furnishings. Although some items were listed in detail on the exemption schedule, testimony indicated that the list was not complete. For example, there was no listing of the debtors' washer and dryer, dishwasher and small kitchen appliance. There also was no mention of the silver service which was valued at $150.00. Debtors' counsel testified that he hoped we would not reach the point that a detailed itemization of property of Schedule B–2 and B–4 would be required. He stated "I hope we don't get to the place we put down six stainless steel forks and three knives. We usually kind of lump that stuff under miscellaneous household goods." However, there as no "miscellaneous household goods" claimed exempt. Rather, some detail was indeed included in the attachment to Schedule B–2 and those items were listed in detail on Schedule B–4 to the petition of Steve Ayers. Whatever the practice may have been in cases filed under the Bankruptcy Act regarding the requirement of detailed listing of property, a claim of exemptions under 11 U.S.C. § 522(d) requires detailed listing.

This court clearly does not allow the debtor to insert a catch all and overly broad exemption claim to cover any and all exemptable items not specifically named in the exemption schedule. In *Hofstetter v. Commerce Union Bank of Nashville, et al. (In re Thompson)*, BK. No. 78–31209 (M.D. Tenn. June 6, 1979) (B.J.), this court ruled that the entry "Property allowable as exempt under T.C.A. § 26–201, et seq. ... $2,500.00" was ineffective to claim any property exempt and thus directed debtor's counsel at the first meeting of creditors to amend the exemption schedule. The amendment was not filed within the time limits of Rule 403 and the trustee's report of no exempt property became final. The court then held that the bankrupt could not claim the property exempt because the trustee had acted for the benefit of the creditors. It should be noted that although the *Hofstetter* court was dealing with exemptions claimed under the Tennessee exemption statutes, the court stated that " ... regardless of state exemption laws, the bankruptcy exemption schedule requires the type of property, its description, location and value must be set out."

In the case of *In re Parker*, BK. No. 77–30734 (M.D.Tenn. Oct. 6, 1977) (B.J.), the bankrupt scheduled his exemptions and then added the phrase "any property overlooked or undervalued by the debtor ... $2,500.00." The trustee denied this exemption claim and the bankrupt objected to its denial. Meanwhile the trustee obtained the court's permission to sell a houseboat free and clear of a second mortgage which had never been perfected. However, before the boat could be sold, it burned; the insurance was collected by the trustee. The bankrupt then attempted to amend its exemption schedule to substitute "partial proceeds from Fireman's Fund Policy OY–147 84 11" for the previous phrase which had been objected to by the trustee. The court held that the debtor could not be allowed to claim the exemption because there was no value attached to it and because the unperfected security interest was still good against him.

(c)ertainly the Act would create an unjust situation if it allowed the trustee to assert superior rights to a creditor, take property, liquidate it, and then let the bankrupt claim the proceeds exempt.

The debtors did not claim any jewelry exempt. The debtors testified that they were asked by counsel's secretary whether they owned any items of significant value. Mrs. Ayers testified that she had the impression that this meant items valued in excess of $200.00. Because of the provisions of 11 U.S.C. § 522(d)(3) regarding the exemption of items (wearing apparel, household furnishings, etc.) with a value of $200.00, such an understanding is possible. This is somewhat refuted however by a listing of some items all but two of which are valued at less than $200.00. Further, this $200.00 limitation clearly has no application to jewelry which has an aggregate limitation of $500.00.

Mrs. Ayers testified that she was asked if she had items of jewelry other than her wedding ring. However, the wedding ring is not even claimed as exempt. A number of items of jewelry were considered at the trial. The testimony of plaintiff's appraiser was that the wedding ring was valued between $250.00 and $300.00. An opal ring was valued at approximately $250.00, a jade ring at between $175.00 and $200.00. A wedding ring from Mrs. Ayers' first husband which had been made into a necklace was valued by plaintiff's witness at virtually zero but the debtors insisted the stone was a diamond and their testimony indicated that it had a value of approximately $500.00. Various watches and bracelets were given a value of approximately $600.00.

Steve Ayers also claimed a pistol worth $100.00 and a riding lawn mower worth $200.00 as exempt. Although no specific federal rule is referred to, the court presumes that the § 522(d)(5) "any property" exemption claim was intended. Mrs. Ayers did not make any exemption claim under this section.

Linda Ayers did not list social security benefits as exempt under § 522(d)(10), although the benefits are substantial—approximately $900.00 per month. These benefits were listed on Mrs. Ayers' statement of Financial Affairs under 2.e. as "900/month Soc.Sec. for child of dec. husband." Although Mr. Ayers testified that $700.00 of that amount was for the benefit of Mrs. Ayers and $200.00 was for the benefit of the children, Mrs. Ayers testified that the benefits were solely for the children. The trustee offered no proof to the contrary, thus the court will presume the benefits are for the children.

In summary, the debtors are allowed their scheduled exemptions. All amendments are denied. The funds attached by the trustee are ordered released, except that the trustee shall retain $5,505 of the $9,100 as payment for: $800 equity in cars; $1,530 purchase of the Chevrolet after filing; $1,400 wedding ring; $250 man's wedding band; $250 opal ring; $175 jade ring; $500 necklace; $600 watches, etc.

Additionally, the trustee shall retain $1,515.36 as reimbursement for expenses as outlined on debtors' Exhibit "Q". These were post-filing expenses taken from pre-filing funds, according to the debtors' testimony. These were non-exempt assets.

It is apparent the substantial portion of the listed items could not have been claimed exempt. As to those items which might have been claimed exempt, under *In re Brewer, supra,* a claim at this time is untimely. No party disputes the $5,000.00 cash on hand listed in the debtors' business petition goes to the estate.

An appropriate order regarding all of the foregoing will be entered.