In the Matter of Paul Warren
WISE, Debtor.

SAVE–ON OIL CO., INC., Plaintiff,

v.

Paul Warren WISE, Defendant.

Bankruptcy No. 80–118 C.

United States Bankruptcy Court,
M. D. Florida,
Tampa Division.

Nov. 5, 1980.

Robert W. Beaudry, Sarasota, Fla., for plaintiff.

W. Grady Huie, Sarasota, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Bankruptcy Judge.

THIS IS a contested discharge proceeding and the matter under consideration is the dischargeability, vel non, of a debt admittedly due and owing by Paul Warren Wise (the Debtor) to Save–On Oil Co., Inc. (Save–On), the plaintiff who instituted this adversary proceeding pursuant to Bankruptcy Rule 409. The amount in controversy is $2,342.07. The claim of non–dischargeability, although not clearly set forth in the complaint, is based on the contention that the Debtor did obtain property by false pretenses and false representations from Save–On. Therefore, the liability of the Debtor is a non–dischargeable debt by virtue of § 523(a)(2) of the Bankruptcy Code. An alternative theory based on § 523(a)(4) is that the debt owed by the Debtor to Save–On was created through fraud while acting in a fiduciary capacity.

The facts germane and controlling to this controversy can be briefly summarized as follows:

At the time pertinent to this controversy, Save–On was a wholesale distributor of gasoline and allied products and the owner of a certain Mobil gasoline station located in Bradenton, Florida. The station, together with the pumps and other fixtures, was

acquired by Save–On sometime in April of 1979 from the previous owner, Mr. Collins. The Debtor, who previously worked as a mechanic for Mr. Collins, entered into a formal arrangement with Save–On whereby Save–On would have gasoline delivered to the station; the Debtor would sell the gasoline; and deposit all monies collected for the gasoline sold in a special bank account set up for this purpose. He was permitted to keep all collections generated through automotive services and he was required to pay Save–On each week for all gasoline sold during the previous week as shown by the meter installed in the pumps.

The record reveals that Mobil Oil Co. billed Save–On for the gasoline delivered to the Debtor's station. The president of Save–On came to the station weekly at the Debtor's request to prepare a check in the amount required for payment of the gasoline delivered during the previous week as indicated by the meter, and would have the Debtor sign the check. Prior to July 17, 1979, there was at least one instance when a check prepared by the president of Save–On and signed by the Debtor was dishonored by the Bank due to insufficient funds. That particular check, however, was later honored when it was redeposited.

The parties continued to follow the same business practice as outlined above. A check signed by the Debtor on July 17, 1979 (Pl's. Exh. # 1) in the amount of $1,405.50 was dishonored by the Bank due to insufficient funds to cover the check. It further appears that the Debtor received additional gasoline during the week of July 17th, and when the president of Save–On came to pick up the check the following week for the gasoline sold, he again prepared a check in the amount of $884.83 (Pl's. Exh. # 2) which was signed by the Debtor. This check was also dishonored by the Bank due to insufficient funds.

It is not in dispute that the Debtor did receive additional gasoline after July 24, 1979 and that he paid for that gasoline. When Save–On was notified by the bank that the second check was also dishonored, Save–On decided to close down the station and stopped any further delivery of gasoline to the Debtor.

The parties always considered the gasoline to be property of Save–On and while it is intimated that the monies collected for the gasoline were also the monies of Save–On, it is clear that the Debtor was able to use the funds for any purpose he desired. He was the only signatory on the account and only had the obligation to make the weekly payments. These are the relevant facts which must be tested in light of the applicable principles of law.

The first claim of non–dischargeability is based on § 523(a)(2) of the Bankruptcy Code which provides:

§ 523. *Exceptions to Discharge*

"(a) A discharge under § 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt–

(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by–

(A) false pretenses, a false representation, or actual fraud, . . . . "

■ This Section of the Code, derived from the pre–Code law, has no specific provisions allocating the burden of proof in a contested discharge proceeding, thus, Bankruptcy Rule 407 is still controlling and applicable. Bankruptcy Rule 407 provides that the plaintiff on a complaint objecting to dischargeability of a particular debt has the burden to establish with the requisite degree of proof each and every element of its prima facie case.

■ The heart of this controversy centers around whether Save–On reasonably relied on the proffered checks and extended additional credit and whether the Debtor acted with the specific intent to defraud Save–On when the Debtor gave Save–On insufficient funds checks for the previous weeks deliveries. While the element of reliance was also an indispensable part of a non–dischargeable claim under the pre–Code law, the Code spells out that the reliance must be a reasonable reliance. H.Rep. No. 95–595, 95th Cong., 1st Sess. at 363 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

■ The record belies the conclusion that Save–On reasonably relied on any representations made by the Debtor. On at least one prior occasion, the Debtor signed an NSF check and more importantly, the president of Save–On had equal access to the checkbook which showed a continuous running balance. Moreover, it was Save–On's president who actually made out the checks for the Debtor to sign. The record further reveals that the method of payment utilized in this case, to wit: a check, was always written to cover deliveries actually made during the previous week and it is, therefore, difficult to fathom the role, if any, the particular NSF checks in question played in Save–On's decision making process to deliver gasoline to the station. Under such circumstances, this Court is satisfied that Save–On has not demonstrated sufficiently, within the meaning of § 523(a)(2), that it reasonably relied on the representation made by the Debtor when the Debtor signed the NSF check. *In re Drake*, 5 B.R. 149, 151 (Bkrtcy.D.Idaho 1980). Moreover, no money or property was obtained by the Debtor as a result of NSF checks since the checks were merely presented in an attempt to pay antecedent debts.

■ Assuming, but not admitting, that Save–On did, to some extent, rely on an implied representation by the Debtor, this still leaves for consideration the element of intent to defraud. The type of fraud required by § 523(a)(2) is as under former § 17(a)(2) of the Bankruptcy Act of 1898, as amended, actual fraud that is a fraud which involves moral turpitude or intentional wrong. See, *Brown v. Buchanan*, 419 F.Supp. 199 (E.D.Va.1979). Generally, payment by check is a representation to the seller that the buyer has sufficient funds in his account to cover the purchase and intends to pay for the purchase. *In re Lubbers*, 5 CBC 506, 508 (W.D.Mich.1975). An NSF check is not, however, conclusive evidence of an intent to defraud, but must be considered in light of all the facts and circumstances. *Lubbers, supra.* Considering the facts and circumstances in this case, this Court is satisfied that the Debtor intended to pay Save–On when it signed each of the NSF checks in question. The Debtor never attempted to conceal the running balance in the Save–On checking account, and the prior course of dealing reveals that a previously dishonored check had been redeposited and paid to Save–On by the Debtor.

This Court, therefore, concludes that Save–On failed to demonstrate the requisite degree of proof that this Debtor intended to defraud Save–On when the Debtor signed the two NSF checks.

This leaves for consideration Save–On's alternative theory in its complaint seeking a determination of non–dischargeability. According to Save–On, the debt owed by the Debtor represents a liability created through fraud while acting in a fiduciary capacity or by embezzlement. Section 523(a)(4) provides in pertinent part as follows:

§ 523. *Exceptions to Discharge*

"(a) A discharge under § 727, 1141 or 1328(b) of this title does not discharge an individual debtor from any debt—

(4) for fraud, or defalcation while acting in a fiduciary capacity, embezzlement or larceny; . . . ."

The term fiduciary is a dominant concept in the administration of estates and has been part of all bankruptcy legislation in this country since 1841. As early as 1844, the Supreme Court had an occasion to interpret the term and to define its meaning. In the case of *Chapman v. Forsyth*, 43 U.S. (2 How.) 202, 207, 11 L.Ed. 236 (1844), the Court held that the term "fiduciary" shall be narrowly defined and refers only to technical trusts and not those which the law may imply from a contract or conduct of the parties.

■ In later cases, the Supreme Court has further defined the term "fiduciary" and has made it clear that a technical trust must exist prior to the act creating the debt and without any reference to that act. *Upshur v. Briscoe*, 138 U.S. 365, 378, 11 S.Ct. 313, 317, 34 L.Ed. 931 (1891). *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934). Thus, before one is found to be a fiduciary he

must have been a trustee before the wrong occurred, without any reference to the wrong and must be independent of the wrong. Constructive trusts are not the type of fiduciary relationships which fall under the exceptive provisions of the Bankruptcy Act. See also, *Matter of Angelle*, 610 F.2d 1335 (5th Cir. 1980).

 The principles appearing from these cases are, of course, in full harmony with the general philosophy of the Bankruptcy Act which is "to give the debtor a 'new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre–existing debt.' " *Lines v. Frederick*, 400 U.S. 18, 19, 91 S.Ct. 113, 113–14, 27 L.Ed.2d 124 (1970), quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1933). The cases are also consistent with the well–established principle that exceptions to discharge should be limited to those clearly expressed in the Statute. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915).

 The Court in *In re Drake, supra* stated that in instances when the property under consideration has been consigned, the only means by which a trust relationship arises, within the meaning of the Bankruptcy Code, is when the property is to be held in trust separate and apart from the Debtor's property. Id. at 152. The record in the present instance clearly reveals that although the funds collected by sales of Save–On's gasoline were kept in a separate account, the Debtor was the only signatory on that account and was permitted to withdraw the funds for any purpose desired provided he came up with enough monies to meet his weekly payment obligation to Save–On. This Court is, therefore, satisfied, that no trust relationship arose from the parties dealings inasmuch as the "separate and apart" requirement of *In re Drake, supra* was not satisfied and, in fact, the parties' relationship in the present case was analogous to that of a consignor/consignee.

It is, therefore, clear that the monies in the present instance in the account were not trust funds and the Debtor could not,

therefore, as a matter of law have incurred a liability for fraud or defalcation while acting in a fiduciary capacity or embezzlement within the meaning of § 523(a)(4).

Having concluded that Save–On has failed to sustain its burden on either count of its complaint, a separate final judgment in favor of the Debtor will be entered in accordance with the foregoing.