In re Edith Marie RIDGWAY, Debtor.

GREEN ACRES INVESTMENT, A Limited Partnership, by Rex L. ANDREWS, General Partner, Plaintiff,

v.

Edith Marie RIDGWAY, d/b/a Ridgway Property Management, Inc., Defendant.

Bankruptcy No. 81–20806.
Adv. No. 81–0285.

United States Bankruptcy Court, D. Kansas.

Nov. 22, 1982.

■■■■■■■■■■■■■■■■■■■■■■■■

Charles R. Harvey, of Covell & Associates, Shawnee Mission, Kan., for plaintiff.

Laurence M. Jarvis, Kansas City, Kan., for defendant.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, J., Bankruptcy Judge.

This matter came on for trial on March 24, 1982, and April 26, 1982, upon a Complaint to Determine Dischargeability of Debt under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(4). Plaintiff, Green Acres Investment, appeared by and through its general partner, Rex L. Andrews, and its attorney of record, Charles R. Harvey of Covell & Associates. Debtor-defendant, Edith Marie Ridgway, appeared in person and by her attorney of record, Laurence M. Jarvis.

### FINDINGS OF FACT

After examining the exhibits, memoranda, pleadings and the file herein; and hearing testimony of witnesses, the Court finds as follows:

1. That the Court has jurisdiction over the parties and subject matter; and that venue is proper.

2. That plaintiff and Ridgway Property Management, Inc. (RPM, Inc.), a Kansas Corporation, entered into a contract on February 20, 1979 (Pl.Ex. # 1). RPM, Inc. agreed to manage rental properties owned by plaintiff and two other entities: Churchill Investments and R&A Co. Rex Andrews signed the contract as general partner of plaintiff, Green Acres Investment. Although Edith Ridgway was president of RPM, Inc., she signed the contract in her personal capacity. Rex Andrews testified that he fully understood that plaintiff was contracting with a company.

3. That on March 29, 1979, RPM, Inc. was dissolved (Pl.Ex. # 28); and thereafter, during the pendency of the contracts, RPM was a sole proprietorship of Edith Ridgway. She testified that her employees managed the properties as much as she did; and that often, she was out of the office and relied heavily on her employees to perform the contract; that she was absent from the RPM office altogether from June to August of 1979.

4. That RPM was reincorporated in Kansas in 1981, after their contracts terminated and prior to the filing of Mrs. Ridgway's bankruptcy petition. (Pl.Ex. # 29)

5. That for the short time during the contract in which RPM, Inc. was a corporation, it was not operated as such. Mrs. Ridgway testified that she couldn't recall ever having an annual meeting; nor could she recall who the other officers were.

6. That Mrs. Ridgway, as sole proprietor of RPM, had the following contractual duties: advertising and leasing apartments; collecting rents and deposits; making all operating expenditures, including maintenance expenditures. She received a monthly management fee of ten percent of the gross income from the properties. She was to remit the net profits to plaintiff each month. In the event monthly expenses exceeded monthly income, because Mrs. Ridgway had to make a mortgage or tax payment, she was under no duty to advance her own money on plaintiff's behalf. She could bill plaintiff for the necessary money. Mrs. Ridgway had to pay all labor and maintenance costs, except parts, supplies and outside labor. She also had to file monthly management reports detailing the income receipts, expenditures and profit. (Pl.Ex. # 1)

7. That on October 31, 1979, plaintiff and Mrs. Ridgway entered into a new contract. (Pl.Ex. # 2) Her fee was reduced to six percent. Mr. Andrews testified that under this contract, it was plaintiff's duty to pay for maintenance. The contract also called for plaintiff to immediately advance money, without waiting for a bill from Mrs. Ridgway, when expenses exceeded income.

8. That plaintiff and Mrs. Ridgway terminated their contractual relationship on March 31, 1980. (Def.Ex. J)

9. That there was conflicting evidence of the total receipts, expenditures and profits during the pendency of the contracts. Plaintiff contended that there were $45,437.31 in receipts, $35,071.61 in expenses and $10,365.70 in profit; but that Mrs. Ridgway only remitted $5,959.96 in profit and owed plaintiff $4,405.74. (*Pl.Ex. # 32*) Mrs. Ridgway contended that there were $49,164.56 in receipts, $42,992.23 in expenses and $6,172.33 in profits of which she remitted $5,903.33 and thus owed plaintiff $269.00. (*Def.Ex. B & C*) Her accounting also indicated that plaintiff owed her $281.53 on the Churchill account. The Court finds that plaintiff's evidence should be given substantial weight. It is a summation of Mrs. Ridgway's monthly management reports. Mrs. Ridgway's evidence is from an accountant she hired to review and rectify her books. The Court further finds that both parties should be able to rely on Mrs. Ridgway's monthly management reports, not on some later self-serving amendment. Therefore, the Court finds that Mrs. Ridgway owes plaintiff $4,405.74 in unremitted profits.

10. That there was even more confusion regarding the total management fees due and paid. The plaintiff contended that Mrs. Ridgway was entitled to $3,799.46 (*Pl.Ex. # 32*) and actually received $4,835.78 (*Pl.Ex. # 6, D. testimony*), through checks numbered as follows: 1004, 1010, 1019, 1027, 1040, 1046, 1079, 1087, 1088, 1097, 1099, 1135, 1138, 1144, 1145, and 1146. Mrs. Ridgway contended that she was entitled to and did actually receive $4,110.21. The Court finds that neither party's figures conform to the fee schedule in the contracts. Mrs. Ridgway was to receive: 5% of the gross income for the partial month of February, 1979 (*Def.Ex. D*); 10% of the gross income for the months of March, 1979, through October, 1979 (*Pl.Ex. # 1*); and 6% of the gross income for the months of November, 1979, through March, 1980 (*Pl.Ex. # 2*). By the Court's calculations, Mrs. Ridgway was entitled to $3,965.40.

11. That Mrs. Ridgway did not always withdraw her management fee each month. She frequently let her fees accumulate in the bank account, to cover insufficient funds checks from tenants. At her discretion, she withdrew some or all of her monthly fee, in cash or by making personal purchases with Green Acre/RPM account checks, in lieu of cash. Although such conduct may be a questionable business practice, the contracts were silent on when or how she was to receive her fees. Therefore, her acts did not breach the contract.

12. That the Court finds that Mrs. Ridgway actually received $4,135.78 in fees: $1,501.00 in checks payable to herself (*Pl.Ex. # 6, Check numbers 1004, 1010, 1027, 1040, 1046, 1088, 1135*); $1,230.00 withdrawn in April, 1980, before closing out the bank account (*Pl.Ex. # 6, Check numbers 1144, 1145, 1146*); and $1,395.00 in checks payable to third parties for personal purchases (*Pl.Ex. # 6 Check numbers 1079, 1097, 1099*). The Court further finds that check numbers 1019, 1087 and 1138 were not management fees, as they were neither payable to Mrs. Ridgway nor payable to third parties for her personal purchases. Rather, they were for maintenance labor.

13. That Mrs. Ridgway paid the second half of the 1978 property taxes on plaintiff's property by two checks: an $857.25 advance from plaintiff; and check number 1032 (*Pl.Ex. # 6*) for $756.63. She mailed both checks to the Wyandotte County Treasurer, but that office never received said checks; and the checks never cleared their respective bank accounts. The Wyandotte County Treasurer billed plaintiff for the missing $1,613.88, plus interest. At plaintiff's request, Mrs. Ridgway reimbursed plaintiff for the $857.25 check. There was no evidence that Mrs. Ridgway received or converted the missing $1,613.88.

14. That Mrs. Ridgway's bookkeeping system was somewhat muddled. Several employees made entries and several compiled the monthly management reports. Perhaps there were too many participants. For example, no one ever discovered that the $756.63 check for taxes had not cleared the bank account. Mrs. Ridgway attempt-

ed to supervise, however. She reviewed the monthly reports before signing them. She occasionally caught and corrected errors. For example, in December of 1979, an employee wrote a $3,115.72 check for 1978 taxes, not realizing that that figure was the year to date total of taxes already paid. The check was duplicitous. Mrs. Ridgway caught the error and voided the check by tearing her signature off. There was no evidence that Mrs. Ridgway converted the $3,115.72.

## CONCLUSIONS OF LAW

### I.

Plaintiff contended that its claim was nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A), which states as follows:

"§ 523. Exceptions to discharge.

*(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—*

\* \* \* \* \* \*

*(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—*

*(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;"*

■ Given the fresh start policy of bankruptcy, creditors objecting to discharge or dischargeability have a heavy burden of proof. Bankruptcy Rule 407, which continues in effect under the Code, requires that the creditor establish a prima facie case by proving each and every fact essential to its objection. *Johnson v. Bockman,* 282 F.2d 544 (10th Cir.1960); H.R. 95–595, 95th Cong., 1st Sess. (1977) 308, U.S. Code Cong. & Admin.News 1978, p. 5787; 4 Collier on Bankruptcy (15th ed.) § 727.03(4).

■ Section 523(a)(2)(A) requires that something of value was obtained by false pretenses, false representations, or other actually fraudulent conduct. The elements of § 523(a)(2)(A) are:

(1) That the debtor knowingly committed actual fraud, false representations or false pretense;

(2) That the debtor had the intent to deceive;

(3) That the creditor reasonably relied on the debtor's conduct; and,

(4) That the creditor was damaged as a proximate result.

*Matter of Vickers,* 577 F.2d 683 (10th Cir. 1978); *Carini v. Matera,* 592 F.2d 378 (7th Cir.1979); *In re Houtman,* 568 F.2d 651 (9th Cir.1978).

■ It has been held that the fraud must be actual and of a kind involving moral turpitude or intentional wrong. Fraud implied or inferred is insufficient. *In re Harris,* 458 F.Supp. 238 (U.S.D.C.Or.1976), aff'd, 587 F.2d 451, 19 CBC 213 (9th Cir.1978); *cert. den.,* 442 U.S. 918, 99 S.Ct. 2840, 61 L.Ed.2d 285 (1979).

The Court is unsure of what conduct plaintiff believed actionable under § 523(a)(2)(A). The instant trial was a two-day fishing expedition. At its conclusion, plaintiff dumped its catch at the Court's feet and expected the Court to cull the futile from the utile. The plaintiff muddied the waters with 32 multiple-paged exhibits and countless allegations, without clarifying what it all meant in terms of § 523(a)(2)(A) or § 523(a)(4).

■ The Court can only surmise that plaintiff contended that Mrs. Ridgway falsely represented the corporate status of RPM and obtained excessive management fees or retained profits by actual fraud. With respect to the former contention, the Court finds that the plaintiff failed to prove the threshold element of § 523(a)(2)(A), which is that Mrs. Ridgway in fact made a false representation. The evidence was that at the time they entered into the first contract, RPM was in fact a valid Kansas corporation.

■ The Court further finds that with respect to the latter contention, plaintiff equally failed in its burden of proof. The Court is unable to conclude from the evidence that Mrs. Ridgway obtained excessive management fees. Plaintiff failed in its burden of proving the fees to which Mrs.

Ridgway was entitled, in that the plaintiff's figures did not conform to the fee schedule in the contracts. Although it did appear by the Court's calculations, that Mrs. Ridgway failed to remit some $269.00 in profits to plaintiff, there was no showing that her conduct was fraudulent. Rather, the evidence suggested that Mrs. Ridgway's bookkeeping was faulty and that neither party was quite sure of who owed who what. The Court finds that Mrs. Ridgway's conduct was negligent and unprofessional, but not fraudulent within the meaning of § 523(a)(2)(A). Plaintiff's objection to dischargeability under § 523(a)(2)(A) is therefore, overruled.

## II.

The plaintiff also contended that its claim was nondischargeable under 11 U.S.C. § 523(a)(4), which states as follows:

"§ 523. Exceptions to discharge.

*(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—*

\* \* \* \* \* \*

*(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;"*

■ Again, the Court is uncertain of what conduct plaintiff believed actionable under § 523(a)(4). Presumably, plaintiff was referring to Mrs. Ridgway's obtaining excessive management fees and profits. However, as previously discussed, plaintiff failed to prove by the preponderance of the evidence, any actual fraud or intentional wrongdoing on the part of Mrs. Ridgway, nor did the plaintiff prove that it had a fiduciary relationship with Mrs. Ridgway. Section 17a(4), the materially similar predecessor of § 523(a)(4), strictly construed "fiduciary". It was limited to express or technical trusts. Trusts implied by law or contract did not create fiduciary relationships. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 153, 79 L.Ed. 393 (1934).

■ Here there clearly was no express trust agreement. The parties' contract established contractual duties but had none of the attributes of a trust agreement such as the duty to preserve the res through investment or the duty to segregate funds. See *In re Walker,* 7 B.R. 563, 7 B.C.D. 68 (M.D. Ga.1980); *In re Wise,* 6 B.R. 867, 7 B.C.D. 131, CCH ¶ 67,778 (M.D.Fla.1980).

Nor was there a technical trust. Courts have found a technical trust where the debtor had duties independent of and in addition to his contractual duties, since a true trustee has duties independent of any contract or agreement. See *In re Kawczynski,* 442 F.Supp. 413 (U.S.D.C.W.D.N.Y. 1977).

Courts have also found technical trusts where a state statute defined the particular relationship as fiduciary. Thus, in *In re Whitlock,* 449 F.Supp. 1383 (U.S.D.C.W.D. Mo.1978) the Court found that the debtor insurance agent was a fiduciary of his insurance company by virtue of Missouri and Kansas statutes; and in *In re Romero,* 535 F.2d 618 (10th Cir.1976), the Court found that a debtor building contractor was a fiduciary of the building owner, pursuant to a New Mexico statute. Here, there is no Kansas statute defining an agent for property management as a fiduciary.

■ Absent a statutory definition, a principal-agent relationship does not fall within the meaning of the bankruptcy law's definition of fiduciary. *Noble v. Hammond,* 129 U.S. 65, 70, 9 S.Ct. 235, 237, 32 L.Ed. 621 (1889).

■ The parties herein had a typical agency relationship, common in many commercial transactions. Although some degree of trust and confidence is reposed in an agent, that does not make the agent a fiduciary. *Matter of Angelle,* 610 F.2d 1335, 1338 (5th Cir.1980) citing *Chapman v. Forsyth,* 43 U.S. (How.) 202, 207, 11 L.Ed. 236, 238 (1844).

■ Therefore, plaintiff has not sustained its burden of proving that Mrs. Ridgway committed fraud or defalcation while acting as a fiduciary. Plaintiff did not even contend that Mrs. Ridgway committed embezzlement or larceny. Accordingly,

plaintiff's objection to dischargeability under 11 U.S.C. § 523(a)(4) is overruled.

In short, plaintiff has shown: that Mrs. Ridgway's bookkeeping was negligent and faulty; that Mrs. Ridgway wrote checks for personal purchases in lieu of management fees; that Mrs. Ridgway did not remit all of the net profits; and that Mrs. Ridgway *may* have paid herself too much for management fees. Plaintiff has not shown that any actual fraud was committed or that Mrs. Ridgway acted with knowledge of fraud or with intent to deceive. Plaintiff has not made a prima facie case under either § 523(a)(2)(A) or § 523(a)(4). Accordingly, any debt that Mrs. Ridgway owes to plaintiff is dischargeable.

IT IS SO ORDERED.