In re Larry G. LITTELL, Judith Diane
Littell aka Diane Littell d/b/a Tri–L
Sports, Debtors.

AUTO OWNERS INSURANCE
COMPANY, Plaintiff,

v.

Larry G. LITTELL, Judith Diane
Littell aka Diane Littell d/b/a
Tri–L Sports, Defendants.

Bankruptcy No. 88–60362.
Adv. No. 88–6067.

United States Bankruptcy Court,
N.D. Indiana,
Hammond Division
at Gary/Lafayette.

April 14, 1989.

Terry E. Johnston, Portage, Ind., for debtors.

Richard M. Davis, Valparaiso, Ind., for plaintiff.

*Findings of Fact Conclusions of Law and Judgment* [1]

KENT LINDQUIST, Chief Judge.

This adversary proceeding came before the Court on April 12, 1989 for bench trial pursuant to Order of Court of March 12, 1987 and pre-trial Order of September 22, 1988.

The Plaintiff's complaint filed May 31, 1988 alleges that it executed a bond as surety with the Defendant Diane Littell, as principal, (hereinafter: "Defendant Diane") to secure the faithful performance of the duties of the Defendants d/b/a Tri–L Sports (hereinafter: "Tri–L") in acting as agents for the State of Indiana (hereinafter: "State") in selling hunting and fishing licenses (hereinafter: "licenses"); that during 1983 "Tri–L" owed the State $17,140.00 for licenses sold, the proceeds of which had not been remitted to the State; that the Plaintiff paid the State said sum pursuant to the bond; and, that by wrongfully using said monies for their own use said conduct constitutes fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny pursuant to 11 U.S.C. § 523(a)(4), and/or obtaining money by false pretenses, false representation or actual fraud in contravention of 11 U.S.C. § 523(a)(2)(A).

The Plaintiff further alleges that the Defendant Larry Littell (hereinafter: "Defendant Larry") executed a promissory note in favor of the Plaintiff in the sum of $17,140.00 as to said debt incurred to the Plaintiff as a result of it paying the State under the bond, and that a judgment was entered in the sum of $14,440.00 plus interest against the Defendant Larry on said note in the Porter Superior Court under Cause No. 64D01–8707–CP1943B.

The Defendants filed their answer on July 22, 1988, and in addition to denying that they committed any act of defalcation while acting in a fiduciary capacity, embezzlement or larceny, or fraud, the Defendants also assert as an affirmative defense that the note by the Defendant Larry to the Plaintiff was executed to extinguish any indebtedness on the bond by the Defendant Diane, and that any indebtedness by the Defendant Larry to the Plaintiff is premised solely on the execution and the default judgment entered in the State Court therein. Thus, the Defendants assert the Plaintiff is now barred by estoppel principles or *res judicata* from asserting that any debt arising out of the failure to remit the license fees to the State and in turn on the bond is nondischargeable under § 523(a)(2)(A) or § 523(a)(4), because the Plaintiff elected to accept the promissory note from the Defendant Larry after the Plaintiff had paid the State on the bond, and thereafter took a judgment thereon in the State Court—no allegations of breach of fiduciary duty or fraud having been made by the Plaintiff in its State Court Complaint.

Plaintiff appears by Attorney Richard M. Davis.

Defendants appear by Attorney Terry E. Johnston.

Submitted. Evidence and arguments heard.

The parties in open court orally stipulated into evidence Plaintiff's Exhibits 1 through 20.

The Plaintiff's initial witness was the Defendant Diane who testified as follows:

1. That she signed the application for the bond on behalf of Tri–L on November 24, 1982 (page 2 of Plaintiff's Exhibit No. 1), but denied that she signed the November 10, bond itself as "Principal" of Tri–L (page 1 of Plaintiff's Exhibit No. 1). The signature on the face of the bond is clearly not the same as on the application. (It is noted that curiously the date of the bond itself is 14 days *prior* to the date of the application for the bond). There are no other signatures by any other principal or duly authorized representative of Tri–L on the bond itself.

---

1. This Order constitutes the Courts Findings of Fact and Conclusions of Law pursuant to Fed.R. Civ.P. 52 as made applicable by Bankruptcy Rules 7052.

2. That she signed said bond application solely at the telephonic request of her husband, the Defendant Larry, who was at work in that he did not have time to execute the same and have it delivered to the State the next day.

3. That she had absolutely no ownership in, connection, or affiliation with, Tri–L in any capacity nor did she receive any monies or property from Tri–L, and did not handle the issuance of the State licenses or the monies received by Tri–L for their issuance.

The Plaintiff's second witness was the Defendant Larry. He testified as follows:

1. That Tri–L was a fishing, bait and tackle store which was operated initially by his brothers Wayne and Terry Littell for about one year, and for the succeeding six or seven years by he and his brother Wayne Littell (hereinafter: "Wayne") until it failed and closed in 1983.

2. That he was actively involved in the management and operation of Tri–L, though he was also employed full time at a local mill at the same time as was Wayne.

3. That he did not handle the paperwork and procedures with the State as to the licenses as this was handled by Wayne, but that he did sell the licenses to the general public.

4. That he and Wayne had an informal partnership as to Tri–L, but that the Defendant Diane was not a partner therein (*See* Plaintiff Exhibit No. 15, IRS Form 1065, Partnership Return of Tri–L showing only the Defendant Larry and Wayne as partners on Schedule K–1).

5. That when the sale of a license was made to the public it was rung up on the cash register a separate item of sale identifiable to the license only towards the end of the business; that the proceeds from the sale of the licenses were always indiscriminately commingled with the proceeds from all other non-license sales of Tri–L to the public, not segregated in any way, and deposited in the one and only general operating bank account of Tri–L from which all trade creditors, rent, wages, etc. as well as remittances to the State were paid.

6. That neither he nor Wayne ever received a draw or salary out of Tri–L, nor did he ever receive a distribution of profits or any property therefrom, as the business was never at anytime profitable. Monies were expended out of the Tri–L account to acquire some adjacent real estate with a view towards building a new store and a fishing pond thereon. (*See* Plaintiff's Group Exhibit No. 14, cancelled checks drawn on Tri–L account).

7. That he and his wife invested a substantial, but unspecified sum of their personal earnings from their regular jobs in Tri–L, and he and Wayne placed second mortgages on their residence to obtain a $25,000.00 loan as capital for Tri–L; that as a result of a failure of the business, both he and Wayne lost their personal residences.

8. That the business of Tri–L failed because of competition from a new K–Mart, and the overall severe economic slump in Northwest Indiana incurred in 1981 and 1982.

9. That a representative of the State never called on Tri–L regarding the licenses or the sale proceeds thereof, and Tri–L was never instructed or ordered by the State to place the proceeds from the sale of the licenses in a separate account.

10. That the promissory note he executed in favor of the Plaintiff on August 4, 1984 in the sum of $17,140.00 (Plaintiff's Exhibit No. 11) was to evidence his debt to the Plaintiff arising out of the Plaintiff paying said sum to the State on the bond for failure of Tri–L to remit the license proceeds to the State.

11. That an undesignated representative of the Plaintiff advised him that when he signed the note, that would be the basis for his liability to the Plain-

tiff for failure to remit the license proceeds, and would "remove" the Defendant Diane's liability.

12. That the procedure that Tri–L followed to obtain authority from the State to sell licenses to the public as agent for the State was as follows:

A. That initially he personally visited the Department of Natural Resources (hereinafter: "DNR") of the State in Indianapolis, Indiana.

B. That he was advised by the DNR that all he needed initially to sell licenses as an agent of the State was a $2,000.00 bond; that no written and signed applications, financial statements, etc. were required by the State prior to receiving authorization to sell licenses.

C. That Tri–L acquired the requisite bond and delivered the same to a clerk at the DNR who gave him a license order form in which he checked off the number and types of license books Tri–L wanted to receive from the State and sell to the public. The State then issued books of licenses as ordered to Tri–L. The books each contained 20 licenses that were consecutively numbered.

D. That no written agreement was ever signed with the State, and he received no instructions to place the proceeds of the sale of the licenses in a segregated account.

E. The licenses were sold for $6.00 each and Tri–L was permitted to retain .50 on each sale and the balance was to be remitted to the State.

Wayne was called as a witness for the Defendant. He testified as follows:

1. That he handled all of the written paperwork, reports and remittances required by the State for Tri–L relating to the licenses from the time that Tri–L commenced business in 1977 or 1978 until it ceased operations in 1983.

2. That he would periodically prepare a written report of licenses sold by Tri–L as agent for the State on a form provided by the State. Said form was in the form as set out in the first page of Plaintiff's Exhibit 2. The reverse side of that form was inventory of the various licenses that Tri–L had received from the State during the reporting period, and licenses on hand (page two of Plaintiff's Exhibit No. 2).

3. That said report provided that Tri–L enclose therewith a check or money order for all licenses sold during the reporting period. The reports were to be filed quarterly according to the form. At the end of the year a separate written report was made returning to the State all unsold licenses for a credit against the bond posted for that year. A new bond was required for each year. The license year had been changed in later years from February 29 of one year to February 28 of the next year, rather than using the calendar year, as licenses were sold for Christmas presents in one year for use in the next succeeding year. The bond term was from e.g., December 1, 1982 through February 29, 1984.

4. That as the financial distress of Tri–L increased, some of the monies received for licenses was expended on other expenses, and thus the practice developed over several years of underreporting, by not reporting all licenses actually sold on the periodic written report to the State, but only reporting a portion of the licenses actually sold in a sum equal to what Tri–L could afford to remit at that time. Tri–L would then attempt to pay the total due for all licenses actually sold at the end of the year when it filed its annual report returning licenses that were not in fact sold that year.

5. That in several years Tri–L was not able to remit the monies due with the end-of-the-year report, leaving Tri–L with an outstanding debt to the State. Notwithstanding this fact, the State with full knowledge of the outstanding balance would again

knowingly consent to issue Tri–L new license books for the forthcoming year if it posted a new bond, and the bond was not less than the sum of the outstanding balance due for the previous year, and the face value of the license books issued to Tri–L for the forthcoming year. Tri–L would then proceed to pay the outstanding balance due from the sale of licenses sold in a previous year out of the proceeds of the new licenses received for the succeeding year, i.e. Tri–L was running a year behind, but the State was always covered by the new annual bond.

6. That in November or December of 1982, the State issued Tri–L $14,-215.00 in licenses for the 1983 license year (Plaintiff's Exhibit No. 6).

7. That during 1983, it became evident that the business was going to go under and would have to close, and accordingly, the remaining unsold licenses were returned to the State; the outstanding bill was left unpaid. Apparently Tri–L ended most of its business activities somewhere in August or September 1983 based on its checking account ledgers (Plaintiff's Exhibit No. 13).

The Court will first address the issue of the liability of the Defendant Diane.

█ There was no evidence adduced whatsoever that she was a partner in or had any interest in Tri–L, although she signed the bond application on its behalf at the request of the Defendant Larry. The mere ministerial act of an agent in executing a document on behalf of a principal, without more—even if the principal of that agent tortiously intended to defraud or defalcate as a fiduciary will not make that agent liable in tort, i.e. create a nondischargeable debt.

In addition, the Defendant Diane's unrefuted testimony was she was never involved in any way in the operation of Tri–L, never handled the licenses, sale proceeds or reports to the State, and never personally received any of the sale proceeds or conspired with any third party that some other person should wrongfully keep the sales proceeds.

At the very most, based on the questionable signature on the bond, and the fact that she was clearly not a principal of Tri–L, Defendant Diane was *contractually* liable on the bond and that this contractual obligation is clearly generally dischargeable in her bankruptcy. The paperwork by the Plaintiff, its agent, and the acceptance of the same as to the Defendant Diane was at best slipshod.

The Court will next address the issue of whether the indebtedness of the Defendant Larry is nondischargeable under § 523(a)(4).

Section 523(a)(4) of title 11 of the United States Code provides as follows:

(a) A discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

\* \* \* \* \* \*

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement or larceny.

The Court in the case of *In re Pariso, d/b/a D. & N. Pariso Industrial Glove Manufacturing Company, d/b/a Indiana Fabric; d/b/a Pariso Ranch,* Case No. 86–61335 (*Conley v. Pariso,* Adversary No. 87–6030), (J. Lindquist, unpub. opin., May 23, 1988), had occasion to analyze and discuss at some length the issue of the nondischargeability of a debt pursuant to 11 U.S.C. § 523(a)(4).

This Court stated in its relevant part as follows:

At the outset the Court would like to note some basic legal principles that apply to adversary proceedings instituted by a creditor to have a debt determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(4).

In keeping with the purpose of the Bankruptcy Code, exceptions to the general rule of dischargeability of debts are to be strictly construed in favor of the Debtor. *In re Marino,* 29 B.R. 797 (N.D.

Ind.1983); *In re Linn*, 38 B.R. 762 (B.A.P. 9th Cir.1984).

The exceptions to dischargeability must be narrowly construed against the creditor's objections, and confined to those plainly expressed in the Code. *In re Norman*, 25 B.R. 545 (Bankr.S.D.Cal. 1982).

This is done to effectuate the fresh start policies of the Bankruptcy Code. *In re Levitan*, 46 B.R. 380 (Bankr.E.D.N.Y.1985); *In re Nicolle* [*Nicoll*], 42 B.R. 87 (Bankr.N.D.Ill.E.D.1984).

Although, the nondischargeability provision of the Bankruptcy Code has no provisions allocating the burden of proof brought under it, the creditor must establish that the debt is non-dischargeable. *In re Bivens* [*Bowers*], 43 B.R. 333 (Bankr.E.D.Pa.1984); *Matter of Reinstein*, 32 B.R. 885 (Bankr.E.D.N.Y.1983); *In re Paley*, 8 B.R. 466 (Bankr.E.D.N.Y. 1981).

The creditor objecting to discharge of a debt in bankruptcy bears a heavy burden of proof to establish that the debt is squarely within the statutory exceptions. *In re Marino*, 29 B.R. 797 at 799, *supra*.

Thus, throughout the remainder of the Court's opinion these legal precepts will be applied to the case at bar.

It has been consistently held that the scope of the concept "fiduciary" under this exception to discharge provision is a question of federal law. *See Matter of Angell* [*Angelle*], 610 F.2d 1335 (5th Cir. 1980); *Matter of Rausch*, 49 B.R. 562 (Bankr.D.N.J.1985); *In re Schultz*, 46 B.R. 880 (Bankr.D.Nev.1985); *In re Adkisson*, 26 B.R. 879 (Bankr.E.D.Tenn. 1983); *In re Paley*, 8 B.R. 466, *supra*.

The Court's Comments on this point in the case of *Matter of McCraney*, 63 B.R. 64 (Bankr.N.D.Ala.1986), correctly and succinctly discusses the applicable law. There the Court stated:

> All questions of dischargeability of debts in bankruptcy proceedings are federal law questions. *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). Less clear is whether federal law or state law determines the underlying issues of a dischargeability issue under Section 523(a)(4).

The Supreme Court appeared to answer this question in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934), by applying federal law. Some Courts of Appeals circumvent *Davis* and apply state law directly, but the majority of them apply *Davis* in connection with a non-*Davis* federal standards analysis of state law.

The Eleventh Circuit sides with the majority. *Matter of Cross*, 666 F.2d 873 (5th Cir.1982) (Unit B). *Cross* relies on *Matter of Angelle*, 610 F.2d 1335 (5th Cir.1980), which explains why both state and federal law should be consulted. "We think it essential to clarify the precise role of state law.... To begin with, the scope of the concept fiduciary under Section 17(a)(4) is a question of federal law." *Id.* 1341. "On the other hand, state law takes on importance in determining when a trust exists." *Id.* "We also believe that state law may play importance in determining whether a specific case involves an express trust." *Id.* Footnote omitted.

Under *Davis v. Aetna* and its progeny, a fiduciary relationship exists for purposes of the Bankruptcy Code if there is a technical trust, not one which the law implies from a contract, *Chapman v. Forsyth*, 2 How. 189, 195, 11 L.Ed. 236 (1844); and it must have existed prior to the act creating the debt and without reference to that act. *Upshur v. Briscoe*, 138 U.S. 365, 378, 11 S.Ct. 313, 317–18, 34 L.Ed. 931 (1890); and *Davis v. Aetna*, 293 U.S. 328, 333, 55 S.Ct. 151, 153–54, 79 L.Ed. 393 (1934).

Under *Cross* and the majority procedure, where state statutes impose fiduciary trusts, additional factors are considered. Does the statute require the individual to maintain a segregated account? *See Matter of Angelle*, 610 F.2d 1335, 1340 (5th Cir.1980); *Matter of Cross*, 666 F.2d 873, 881 (5th Cir.

1982) (Unit B); *Matter of Banister,* 737 F.2d 225, 229 (2nd Cir.1984), *cert. denied,* 469 U.S. 1035, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984); *In re Katzen,* 47 B.R. 738 (Bkrtcy.D.Mass.1985). Does the statute create the basic elements of a trust? Is a *res* defined? Are fiduciary duties spelled out? *In re Pedrazzini,* 644 F.2d 756, 759 (9th Cir. 1981); and *In re Lipke,* 54 B.R. 704 (Bkrtcy.W.D.Wis.1985).

*Id.* at 65–66 (Footnotes omitted).

The Seventh Circuit in the case of *Matter of Thomas,* 729 F.2d 502 (7th Cir. 1984), applied federal standards to a Wisconsin statute without applying *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, *supra.*

Thus, state law is important in determining when a trust relationship exists. That is, in determining whether a requisite trust exists, the Court should consult state law although the issue ultimately remains a federal question. *In re Short,* 818 F.2d 693 (9th Cir.1987); *In re Schultz,* 46 B.R. 880 (Bankr.D.Nev.1985); *In re Niven,* 32 B.R. 354 (Bankr.W.D. Okla.1983); *In re Ballard,* 26 B.R. 981 (Bankr.D.Conn.1983); *Matter of Murphy,* 9 B.R. 167 (Bankr.Va.1981).

The broad, general definition of fiduciary, involving confidence, trust and good faith, is inapplicable in a dischargeability context, thus excluding ordinary commercial relationships from the reach of the section of the Bankruptcy Code excepting from discharge certain debts incurred in a fiduciary capacity. *In re Schultz,* 46 B.R. 880, *supra.*

It has been repeatedly held that a debtor is not a fiduciary within the meaning of 11 U.S.C. § 523(a)(4) in the absence of any evidence that an express or technical trust existed between the debtor and the creditor. *In re Ballard,* 26 B.R. 981, *supra; In re Lawther [Lowther],* 32 B.R. 638 (Bankr.W.D.Okla.1983); *In re Baiata,* 12 B.R. 813 (Bankr.E.D.N.Y. 1981).

However, when a state statute imposes trust-like obligations on parties engaging in certain kinds of contracts the contracting parties may be trustees for purposes of 11 U.S.C. § 523(a)(4). *See In re Bacher,* 47 B.R. 825 (Bankr.E.D.Pa.1985); *In re Gagliano,* 44 B.R. 259 (Bankr.N.D.Ill. 1984).

Based on the foregoing requirements it has also been consistently held that constructive trusts, or those implied by law, that created duties *ex maleficio,* are not the types of fiduciary relationships that fall under 11 U.S.C. § 523(a)(4). *See In re Tolcott [Talcott],* 29 B.R. 874 (Bankr. D.Kan.1983); *In re Ayers,* 25 B.R. 762 (Bankr.M.D.Tenn.1982); *In re Barwick,* 24 B.R. 703 (Bankr.E.D.Va.1982); *In re Ridgway,* 24 B.R. 780 (Bankr.D.Kan. 1982); *Matter of Wise,* 6 B.R. 867 (Bankr.M.D.Fla.1980).

What the foregoing cases are saying is that since an express or technical trust is required the fiduciary relationship must be shown to have existed *prior* to the creation of the debt in controversy. *In re Gagliano,* 44 B.R. 259, *supra.* That is, the Plaintiff must show the Debtor was a trustee *before* the wrong occurred, without any reference to the wrong and be independent of it. *Matter of Wise,* 6 B.R. 867, *supra; In re Marshall,* 24 B.R. 105 (Bankr.W.D.Mo.1982).

Absent statutory definition or special considerations, ordinary commercial relationships such as principal and agent do not fall within the meaning of fiduciary under the Bankruptcy Code, *In re Ridgway,* 24 B.R. 780, 785, *supra; In re Paley,* 8 B.R. 466, *supra.* This is also true of one who holds the status of a bailee, without more. *In re Hohman [Holman],* 42 B.R. 848 (Bankr.E.D.Mo. 1984); *Matter of Adams,* 24 B.R. 252 (Bankr.W.D.Mo.1982).

Even the fact that a commercial agreement contains the word "trust" does not make the agreement a trust agreement nor create a fiduciary relationship for nondischargeability purposes, but it is the substance and character of the debt relationship, and not its form that determines whether fiduciary relationship exists. *See In re Gallaudet,* 46 B.R. 918 (Bankr.D.Vt.1985); *In re Tolcott [Tal-*

*cott* ], 29 B.R. 874 (Bankr.D.Kan.1983); *In re Paley,* 8 B.R. 466, *supra.*

Thus, mere contract jargon is not determinative of the existence of a fiduciary relationship and the determinative causes are whether there was an effective duty to segregate funds, an insistence on segregation of funds, formality of relationship and requirement of an accounting. *Matter of Storms,* 28 B.R. 761 (Bankr.E.D.N.C.1983).

A review of the following cases all consistently indicate that an ordinary commercial agreement, although it may contain certain elements of trust and confidence, is not sufficient standing alone to establish an express or technical trust.

For example, it was held in *In re Snellgrave [Snellgrove*], 15 B.R. 149 (Bankr.S.D.Fla.1981), that where debtors who were president and general contractor, diverted funds from a certain construction project to other construction projects were not acting in a fiduciary capacity.

And a floor plan financing arrangement between a dealer and a creditor does not normally give rise to a trust relationship as to preclude discharge. *In re Tolcott [Talcott* ], 29 B.R. 874 (Bankr.D.Kan.1983); *Accord: In re Gallaudet,* 46 B.R. 918 (Bankr.D.Vt.1985); *In re Hickey,* 41 B.R. 601 (Bankr.S.D.Fla.1984); *In re Clifton,* 32 B.R. 666 (Bankr.D.N.M.1983); *Matter of Chambers,* 23 B.R. 206 (Bankr.Wis.1982); *In re Miles,* 5 B.R. 458 (Bankr.E.D.Va.1980).

A debtor who managed creditor's property was merely a typical agency relationship where there was no express technical trust agreement between debtor and creditor. *In re Ridgway,* 24 B.R. 780 (Bankr.D.Kan.1982).

An agreement between Airline Ticket Associations and debtors who conducted a travel service and who did not turn over proceeds of sale per agreement between the parties did create a fiduciary relationship when agreement appeared to be no more than ordinary commercial contract and the agreement did not re-

quire debtors to segregate funds. *In re Paley,* 8 B.R. 466, *supra. See also, In re Chick,* 53 B.R. 697 (Bankr.D.Ore.1985), where although the agreement had boiler-plate language evidencing a trust agreement, there was no specific requirement to segregate funds no fiduciary relationship was established.

An insurance agent's indebtedness for premiums did not create a fiduciary capacity, embezzlement or fraud when though the agency contract provided premiums were to be held in trust, the agent was not required to segregate the funds in a separate bank account and periodically account for premium collections. *Matter of Storms,* 28 B.R. 761, *supra.*

The mere fact a contractor-debtor told creditor he would pay an unpaid supplier did not create a fiduciary relationship but a mere debtor-creditor relationship. *In re Boese,* 8 B.R. 660 (Bankr.D.S.Dak.1981).

The Court in *In re Taylor,* 58 B.R. 849 (Bankr.E.D.Va.1986) in holding that the existence of a partnership did not create a fiduciary relationship between partners pursuant to the Uniform Partnership Act stated as follows:

> The Michigan bankruptcy court[2] ... overlooks the old United States Supreme Court case of *Chapman v. Forsyth,* 2 How. 202, 43 U.S. 202, 11 L.Ed. 236 (1844). In that case, the Supreme Court first clarified the meaning of the term "fiduciary" as used in a bankruptcy statute similar to section 523(a)(4):
>
> The second point is, whether a factor, who retains the money of his principal, is a fiduciary debtor within the act. If the act embrace such a debt, it will be difficult to limit its application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country, confidence is re-

---

**2.** *In re Kraus,* 37 B.R. 126 (Bankr.E.D.Mich. 1984).

posed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard of a trust. But this is not the relation spoken of in the first section of the act. The cases enumerated, "the defalcation of a public officer," "executor," "administrator," "guardian," or "trustee," are not cases of implied but special trusts, and the "other fiduciary capacity" mentioned, must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not, therefore, within the act. This view is strengthened and, indeed, made conclusive by the provision of the fourth section, which declares that no "merchant, banker, factor, broker, underwriter, or marine insurer," shall be entitled to a discharge, "who has not kept proper books of accounts." In answer to the second question, then, we say, that a factor who owes his principal money received on the sale of his goods, is not a fiduciary debtor within the meaning of the act.

*Chapman v. Forsyth, supra* 2 How. at p. 207.

This interpretation was later approved by the Supreme Court in *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934). Clearly then, the term "fiduciary" as used in 11 U.S.C. 523(a)(4) is limited to the class of fiduciaries including trustees of specific written declarations of trust, guardians, administrators, executors, or public officers and, absent special considerations, does not extend to the more general class of fiduciaries such as agents, bailees, brokers, factors, and partners. Thus, the alleged indebtedness at issue in this case is not a debt for fraud or defalcation while acting in a fiduciary capacity. *Id.* at 851.

\* \* \* \* \* \*

When there are no reported Indiana decisions on the issue in controversy, or the Court is faced with state law issue that is unsettled, the Federal Court must look to all available data and adopt a rule which it believes the Indiana Supreme Court would adopt. *Heinheld [Heinhold] v. Bishop Motor Exp., Inc.*, 660 F.Supp. 382 (N.D.Ind.1983 [1987]); *Neofes v. Robertshaw Controls Co.*, 409 F.Supp. 1376 (S.D.Ind.1976). In making such a decision without a discernible doctrinal trend, the Court may reasonably assume that the state court will follow the rule that appears best to effectuate the policies that underlie the rule, *Bowen v. U.S.*, 570 F.2d 1311 (7th Cir.1978).

However, it must be remembered that whether the debtor's obligation is nondischargeable pursuant to 11 U.S.C. § 523(a)(4) remains a *federal* question and this court need only look to state law for guidance on the issue of whether the debtor is a fiduciary or their has been a defalcation.

\* \* \* \* \* \*

It is thus true that although constructive or implied trusts are specifically excluded from the definition of a fiduciary under bankruptcy law, statutory trusts may be found to establish a fiduciary status if the necessary elements are found.

The elements necessary to create an express or "technical" trust include 1) sufficient words to create a trust, 2) a clearly defined trust *res*, and 3) an intent to create a trust relationship. *In re Kelly [Kelley]*, 84 B.R. 225 (Bankr.M.D.Fla. 1988). It has also been held that a statute which makes the act of misappropriating funds a crime, without requiring those funds to be segregated at the outset is insufficient to create a trust for the purposes of § 523(a)(4). *Id.* at 230. However, the Seventh Circuit in the case of *Matter of Thomas*, 729 F.2d 502, *supra*, in considering a Wisconsin "theft by contractors" statute which provided that all moneys, bonds or warrants paid or to become due to any prime contractor or subcontractor for public improvements are a trust fund only in the hands of a prime contractor or subcontractor, and the use of those moneys for any purpose other than payment of claims on a public improvement before the claims have been

satisfied constituted theft constitutes a fiduciary relationship pursuant to 11 U.S.C. § 523(a)(4). In *Thomas*, the plaintiff was the prime contractor on a construction project. The Defendants entered into a contract with the Plaintiff to do the landscaping for the project. The Plaintiff alleged it paid the Defendants $21,530.00 for the landscaping which they allegedly held in trust per the above statute, and the Defendants used the monies for other purposes requiring the Plaintiffs to complete the landscaping project at an additional cost. The Court held that under trust law the Debtors' obligation to the Plaintiff was nondischargeable in the amount of the trust funds diverted by them. The Court cited *In re Cary Lumber [Carey Lumber Co. v. Bell]*, 615 F.2d [370] at 374 [ (5th Cir. 1980) ] with approval which construed a similar Oklahoma lien trust as an express trust and not a trust *ex maleficio*, in that the statute clearly defined the trust *res*, and charged the trustee with affirmative duties in applying the trust funds. The *Cary [Carey]* court noted that, while lacking a trust agreement executed by the parties, the Oklahoma lien trust statute was an express trust that effected a fiduciary relationship; that the trust relationship was established upon receipt of the funds, and that the funds are to be held in trust even though there may be no beneficiary at the time they are received. *Cf. In re Boyle*, 819 F.2d 583 (5th Cir.1987), where the court held that the Texas Trust Code and its imposition of fiduciary duties on trustees did not apply to statutory construction trust funds where the construction trustee is under no obligation to segregate funds or to apply proceeds from each specific job only to the expenses of that job, and criminal penalties are imposed only if the trustee diverted from creditors with intent to defraud.

\*   \*   \*   \*   \*   \*

As stated in *In re Pedrazzini*, 644 F.2d 756 (9th Cir.1981), the precise manner of the creation of the trust, by consent or by a statute, is of little importance. "Rather the focus should be on whether true fiduciary responsibilities have been imposed." *Id.* at 758, n. 2. *Id.* at 12–30.

The Court will now examine the relevant Indiana law.

Indiana Code 14–2–7–1 requires, with certain exceptions, that a license from the State is required to take any wild animal.

Indiana Code 14–2–7–2 provides that the State shall issue all licenses, or that they may be issued by agents duly appointed by the State or by the Circuit Court Clerk.

Indiana Code 14–2–7–6 extant at the time of the acts alleged provided as follows:

Sec. 6. (1) Each license agent who is authorized to sell licenses under the provisions of this article shall retain a fifty cent ($.50) service fee for each license sold except, the sub-agents of the clerk of the circuit courts shall be entitled to a twenty-five cent ($.25) service fee from each license sold and the remaining twenty-five cents ($.25) of the service fee shall be retained by the clerk of the circuit court or the distributing agent who distributes licenses to the sub-agents.

(2) *Each* clerk of the circuit court or *agent selling licenses* under the provisions of this article *shall report to the director within five (5) days after the close of each quarter the number of each respective kind of licenses sold by him during the preceding quarter, the serial numbers thereof, the number of unsold licenses of each kind remaining in his possession, and at that time shall remit all monies collected for the licenses:* Provided, That the clerk of the circuit court in each county shall retain as the property of the county the service fees provided by IC 14–2–7–6(1) from the sale of licenses sold by him and the clerk shall pay the fees promptly into the county general fund as other fees are paid, subject to the provisions of IC 14–2–7–6(3).

(3) Each clerk of the circuit court who is a duly authorized representative of the state department for the sale of hunting and fishing licenses may designate sub-agents in his respective county to sell

licenses. Each year the sub-agent in every case shall execute a bond payable to the State of Indiana in an amount not less than five thousand dollars ($5,000), but large enough to cover the value of licenses distributed to the sub-agent and with such surety as shall be approved by the clerk, conditioned for the proper selling of the licenses and proper accounting for all monies due to the state therefore.

All agents designated by the director and serving directly under his supervision shall be bonded in the same manner and to the same effect as sub-agents. All license agents of the division other than employees of the State of Indiana, shall retain the service fees from the sale of licenses listed in section 5 of this chapter. All agents shall return the carbon copies or stub of licenses sold upon request of the director.

(4) It shall be unlawful for any person, directly or indirectly, to charge, collect or receive for any license required under the provisions of this article more or less than the amount specified in this article, regardless of the official capacity of the person or his relationship to the licensee.

(5) All fees shall be deposited into the fish and wildlife fund of the department of natural resources. *As amended by Acts 1979, P.L. 138, SEC. 3; Acts 1980, P.L. 105, SEC. 1.*

The State has not enacted any administrative regulations to implement the above statutes.

■ It is clear from the evidence that no written agreement was ever entered into between the State and Tri–L wherein a formal trust was created with Tri–L as trustee, and the State as beneficiary, whereby the proceeds from the sale of licenses were to be specifically segregated by Tri–L and held in trust for the sole and exclusive benefit of the State.

Thus, the Court must look to I.C. 14–2–7–6 to see if a statutory, express and technical rather than a constructive trust or one *ex maleficio* was created that would make the Defendant Larry a "fiduciary" of the State in federal bankruptcy standards

as enunciated in *Davis v. Aetna Acceptance Co., supra.*

The statute does not create a true fiduciary relationship. The seller of the licenses is merely referred to throughout the statute as an "agent". No language is found in the statute from which it can be inferred that *formal* or technical trust-like duties are imposed *prior* to the receipt of the license proceeds. The proceeds of sale are not treated as a res of a trust, and although a quarterly accounting was required there is no requirement in the statute that the proceeds from the license sales be segregated and deposited in a separate account. The unfettered use of the license proceeds without protest by the State evinces a lack of an entrustment obligation or wrongful appropriation. The mere obligation of an agent to remit proceeds to a principal does not create a fiduciary relationship for the purposes of § 523(a)(4). *In re Ridgeway*, 24 B.R. 785, *supra.* No trust res was established by the statute. The liability to the State is *ex maleficio* upon failure to remit, and a trust relationship is not established at the outset. This is further evidenced by the routine practice of the State in continuing to issue licenses for a forthcoming year to Tri–L when there was full knowledge by the State that not all sale proceeds had been remitted as long as there was a sufficient surety bond on file to cover the outstanding balance and the amount of the new licenses issued. The Court must look not only to the language of the statute, but to the relationship and acts of the parties to determine if a trust exists. *In re Long*, 44 B.R. 300, 305 (Bankr.D.Minn.1983).

The Court's research has unearthed three analogous cases, all of which find the debt dischargeable. *See, e.g., In re Lucas*, 21 B.R. 585 (Bankr.W.D.Pa.1982) *Aff'd*, 41 B.R. 923; *In re Myers*, 52 B.R. 901 (Bankr. E.D.Va.1985); *In re Schnitz*, 52 B.R. 951 (Bankr.W.D.Mo.1985). *Cf. In re Cairone*, 12 B.R. 60 (Bankr.R.I.1981).

Accordingly, the Court concludes that the debt of the Defendant Larry to the Plaintiff is not nondischargeable under § 523(a)(4).

Finally, there was no evidence in the record that the Defendant Larry ever made a false representation of a material fact to the State which was reasonably relied on by the State to its damage. Thus, the debt of the Defendant Larry is not nondischargeable pursuant to § 523(a)(2)(A). It is therefore,

ORDERED, ADJUDGED, AND DECREED, that the Plaintiff take nothing by its complaint, that the Defendants have judgment of no liability, and the indebtedness of the Defendants to the Plaintiff is generally dischargeable in their bankruptcy pursuant to 11 U.S.C. § 727.